**UNITED STATES of America**

v.

**Robert L. LAWHORNE.**

**No. CR. 3:96cr139.**

United States District Court, E.D. Virginia, Richmond Division.

Nov. 16, 1998.

James B. Comey, Sara Flannery, United States Attorney's Office Richmond, VA, for U.S.

John A. Gibney, Richmond, VA, for Defendant.

## MEMORANDUM OPINION

PAYNE, District Judge.

The defendant Robert L. Lawhorne has filed a MOTION FOR MISTRIAL BASED UPON IMPROPER CONTACT BETWEEN A GOVERNMENT PROSECUTOR AND A JUROR AT THE DEFENDANT'S TRIAL. For the reasons set forth below and, pursuant to Fed.R.Crim.P. 52(b), the verdict is set aside, the Judgment In A Criminal Case entered herein on December 12, 1997 is vacated and a new trial shall be had within the time set by 18 U.S.C. § 3161(e) if the United States intends to proceed further with the charge.

## BACKGROUND

On December 3, 1996, Lawhorne was indicted for possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). The case was tried to a jury on March 20, 1997.

The evidence presented by the Government was from Deputy Sheriff Richard Rose, Deputy Sheriff George Bond, Officer Michael Bennett and Mr. William Flynn. Rose testified that, while he and Bond were traveling on Interstate 95, they passed the defendant's pickup truck. Rose was driving and glanced to his right, across Bond, and into the defendant's truck. As his car drew alongside the defendant's truck, Rose observed a pistol "pointing out the driver's side door window towards our vehicle." (Tr. at 63–64.) [1] Startled by what he saw, Rose told Bond that there was a gun in the adjacent car, then slowed the speed of his vehicle and fell in behind the defendant's truck at which time he claimed to have observed Lawhorne holding the pistol in his right hand and pulling

the slide of the weapon with his left hand. (Tr. at 64.) Bond testified that, in response to Rose's statement and while he and Rose were beside (not behind) the defendant's truck, Bond turned to his right and saw a gun pointing straight in the air in the defendant's right hand and he observed the defendant operating the slide of the weapon with his left hand. (Tr. at 83, 89.)

Cross-examination showed that, because of the relative heights of defendant's truck and the car in which Rose and Bond were riding, there was doubt whether Rose could have seen what he claimed to have seen. Also, the high rate of speed at which both vehicles were traveling was argued as an additional factor why the testimony of Rose and Bond was not credible, especially if both of Lawhorne's hands were off of the steering wheel and on the weapon.

Bond communicated with his office (the Stafford County Sheriff's Department) to determine ownership of the truck and shortly thereafter was informed that the registered owner's driver's license had been suspended. Because, by then, Rose and Bond were beyond the boundaries of Stafford County, they requested the Prince William County authorities to make a traffic stop. The defendant's vehicle was stopped by Prince William Officer Bennett, who, in rather equivocal terms, testified that, after he stopped the defendant's truck, the defendant said that he had shown the handgun to his wife. Bennett later acknowledged some uncertainty about exactly what the defendant had said. (Tr. at 144, 146, 147.) After the traffic stop, Bond initiated a criminal background check and learned that Lawhorne was a convicted felon. The defendant was then arrested for being a felon in possession of a firearm.[2]

The evidence showed that the firearm in the truck had been purchased earlier that day from the Fredericksburg Golden Pawn Shop. William Flynn, an employee of the pawn shop, showed guns to Lawhorne and

---

1. Citations to the transcript of the trial on March 20, 1997 will be Tr. at _____.

2. The record shows, but the jury never knew, that Lawhorne's previous felony conviction was

for aggravated assault on Rose (he pulled the trigger of a weapon pointed at Rose; the weapon misfired).

his wife on the morning of October 21 and, during the process, the couple passed several guns back and forth between themselves. The firearm purchase forms were signed by Mrs. Lawhorne, as purchaser, and Lawhorne paid for the weapon with a check. The undisputed evidence was that the firearm was purchased for Mrs. Lawhorne to use for self-protection. Notwithstanding that the defendant reportedly told Officer Bennett, who executed the traffic stop, that he had shown the weapon to his wife, the defendant claimed in his testimony at trial that, in the pickup truck, he had not handled the weapon in the manner described either by Rose or by Bond. Mrs. Lawhorne confirmed her husband's version of events.

With this general background in mind, it is appropriate to recite the facts and procedural history pertinent to the motion currently before the Court for decision.

## PROCEDURAL HISTORY AND FACTS RELEVANT TO THE MISTRIAL MOTION

Jury selection began at 9:30 a.m. March 20, 1997. During the voir dire examination, the members of the panel were required to disclose whether they knew the lawyers in the case or had any business or social relationships with them. The following exchange occurred:

Now, does anybody know [the Prosecutor] or her client, or have any business relationship with [the Prosecutor] or her client? [3] All right, your name, sir? Stand up and give me your name.

THE JUROR: [identified by name].[4]

THE COURT: All right, [the Juror]. Is it [the Prosecutor] you know or somebody else?

THE JUROR: [The Prosecutor.]

THE COURT: And how do you know [the Prosecutor]?

THE JUROR: I have a jewelry business on the side. I have had a couple of shows in her home, and I also know—I used to attend the church she now attends.

THE COURT: Do you have any business relationship with [the Prosecutor]? You said you had some jewelry shows in her home. Do you pay her something, or does she pay you something?

THE JUROR: She has—well, it's the company I represent who she has paid. I collect the money, but I send it to the company.

THE COURT: Right. So you don't pay her anything; the company you work for does?

THE JUROR: Gives her, yes.

THE COURT: For which she works and provides her house.

THE JUROR: And I work and I make money by coming into her home.

THE COURT: Well, would the relationship—and you say you also know [the Prosecutor] from church?

THE JUROR: I used to attend the church that she now attends.

THE COURT: *Would the relationship you have just described with [the Prosecutor] keep you in any way from giving the parties in this case,* both the Government and the defendant, *a fair trial, basing your decision only on the evidence in the case and putting aside entirely your knowledge of and relationship with [the Prosecutor]?*

THE JUROR: It shouldn't affect it.

(Tr. at 10–11) (emphasis added). Neither party challenged the Juror for cause and, when the Juror was selected to sit on the petit jury, the defendant did not peremptorily challenge him.[5]

Following presentation of the evidence outlined in the BACKGROUND section above, the case was submitted to the jury at 3:40

---

**3.** There is no dispute as to the identity of the Prosecutor who will be referred to as "the Prosecutor."

**4.** There is no dispute as to the identity of the Juror who hereafter will be referred to as "the Juror."

**5.** The record does not reflect why no peremptory challenge was made.

p.m. At 4:50 p.m. the jury presented the following questions:

(1) If the defendant does not realize the complete meaning of possession, as defined in Jury Instruction Number 27, paragraph 5, is he guilty of "knowingly" possessing a firearm?

(2) Does giving verbal instruction regarding use of the gun constitute possession or control?

(3) Does the fact that they are married make the purchase a joint possession?

(4) What is the definition of "control"?

(Tr. at 187.) After consultation with counsel, the questions were answered as set forth fully in the transcript of trial. A summary of the answers, however, is appropriate.

Question Number 2 was answered:

if by verbal instructions in that question you mean that the defendant was giving verbal instructions to his wife, then the answer to your question is no.

(Tr. at 213.) Then Question Number 3 was answered. The response was:

So, first, as to Question Number 3, you are advised that the Government does not contend that the fact that Mr. and Mrs. Lawhorne are married made the purchase a joint possession.

That response was supplemented by the following:

Further, as to Question Number 3, the mere fact that Mr. and Mrs. Lawhorne are married does not make any possession a joint possession. In other words, the mere fact of marriage does not establish joint possession, if there was a possession.

(Tr. at 213–14.)

Questions 1 and 4 were answered by referring the jury to the instructions originally given on possession which were augmented by discussing the meaning of the term "knowing" in context of each aspect of the definition of possession. Also, "control" was defined to mean "the power, ability or authority to manage, to direct, to superintend,

to restrict, to regulate, to govern, to administer or to oversee." (Tr. at 214–17.) The jury then returned to the jury room and resumed deliberations.

At 7:45 p.m. the jury submitted the following question:

What if we are not unanimous? Will there be an acquittal or will there be a re-trial?

After consultation with counsel, the jury was informed of the need for unanimity in the verdict and was given an *Allen* charge. (Tr. at 226–29.) At 9:10 p.m. the jury returned a verdict of guilty on the one count charged in the Indictment.

The jury was polled at the defendant's request and, upon polling, one of the jurors answered "reluctantly yes" to the question whether the verdict was in fact hers. (Tr. at 230.) Upon individual examination by the Court in the presence of counsel and the defendant, the juror explained her answer to mean that she had followed her head, *i.e.* the instructions, instead of her emotion. (Tr. at 239–40.) Thereafter, counsel for the defendant verbally moved for a mistrial. The Court considered the motion to be a motion for mistrial, for judgment of acquittal and for new trial and directed briefing following preparation of the transcript.

Pursuant to that order, Lawhorne filed, on June 13, 1997, a Motion For Judgment of Acquittal, a Motion for New Trial and supporting briefs. Both motions were based on the insufficiency of the evidence to support a conviction. Although the Court expressly articulated that it did not find the testimony of Rose or Bond to be credible,[6] the motions were denied on August 7, 1997 for the reason that questions of credibility were to be resolved by the jury. Sentencing was set for October 31, 1997.

On October 30, 1997, Lawhorne attempted to commit suicide by taking an overdose of prescription medication. Hence, sentencing was continued generally, pending a determination of the defendant's mental condition.

---

**6.** This assessment was based on the inconsistencies in their testimony (after considering the consistent aspects thereof) and their rather remarkably uneasy demeanor while testifying. Also, the

testimony of Lawhorne and his wife was credible and the testimony of Officer Bennett was equivocal, speculative and uncertain.

On December 12, 1997, after several continuances occasioned by a belated motion for downward departure filed by the defendant and by the time required to resolve motions respecting the defendant's mental status, the defendant was sentenced to a term of 37 months confinement, placed on supervised release for a term of three years, directed to perform 100 hours of community service, directed to participate in a substance abuse and mental health program and ordered to pay a special assessment of $100.00. The Judgment In A Criminal Case was entered on December 12, 1997.[7]

On December 18, 1997, a Notice of Appeal was filed; and on December 22, 1997, Lawhorne's counsel filed, in the Court of Appeals, a DOCKETING STATEMENT to which was appended a statement of issues to be raised for appeal. Issue No. 2 was: "[w]hether the jury was tainted by virtue of a juror having some kind of conversation with the prosecutor during trial."

The first time an issue of that sort was directed to the attention of this Court, however, was on January 12, 1998, when the Court received a letter from the defendant which contained the following allegations:

> Also your Honor during the trial, one of the *jurors*, [ ] who sat on the first row, directly in front of the U.S. Attorney and who had a business relationship with the U.S. Attorney had *communication with the U.S. Attorney during the trial*. My mom witnessed this and *immediately* moved forward and *told my attorney and myself about it.* [Defense counsel] said he would take care of it, but did nothing at that time or since to bring it to the Court's attention. *Then during one of the questions when the jury was out, they came back into the courtroom and this juror gave the U.S. Attorney the ok sign.* Again

> *[defense counsel] was told and did nothing.*

(emphasis added).

Also, on January 12, 1998, the Court received a letter from the defendant's mother in which she stated:

> My daughter-in-law and I were sitting on the front row behind [defense counsel] when the jury came back in to ask a question of you, I saw a *gentleman jury [sic] stop by and say something to [the Prosecutor] about the case. He looked over at [the Prosecutor] and gave her the high sign with his hand—he also winked at her.* I immediately let [defense counsel] know by tapping him in the back and telling him what had happened.

(emphasis added).

By Order dated January 16, 1998, the Court directed that those letters be sent to counsel for both parties; and the United States and counsel for the defendant were ordered to file responses. The United States complied with that order on January 27, 1998 and, on February 2, 1998, the defendant responded by moving for a mistrial, alleging as the basis therefor "improper contact between the prosecutor and a juror at defendant's trial."[8] The United States replied on February 9, 1998.[9]

In support of the February 2 motion for mistrial, the defendant offered the affidavits of his wife, Angela Lawhorne, and his mother, Margaret Lawhorne. The defendant's wife averred:

> On the day of my husband's trial, the jurors had been out deliberating and came back in the Courtroom to hear the answers to their questions.

> As they were filing through, Juror [ ], leaned slightly in [the Prosecutor's] direction and said something to her. I didn't mention because I previously mentioned a

---

7. On December 16, 1997, the Court, at the instance of Lawhorne, granted a motion for the performance of a psychiatric examination to determine the defendant's mental condition respecting the place and terms of imprisonment.

8. For reasons not apparent, the document was not filed until February 17, 1998, or it was filed on February 7, 1998 but given a stamped date of February 17, 1998. In any event, the pleading

was served on the United States before February 9, 1998, because the United States replied on that date.

9. Further proceedings were suspended while the defendant was undergoing psychological examination at the Federal Correctional Institute at Butner, North Carolina with respect to an appropriate site for imprisonment.

lady juror talking to [the Prosecutor] to [defense counsel], and [defense counsel] admonished [the Prosecutor], who explained the juror commented on her dress. When the jurors were getting up to leave, my mother-in-law, Margaret Lawhorne, punched me in the arm and told me about the "wink" and "high sign."

The defendant's mother swore that:

On the day of my son's trial, the jurors were walking back into the Courtroom to ask questions of clarification of the meaning of possession. The Juror, [ ], came in and passed the Prosecutor's table. I saw him look right at [the Prosecutor], lean into the table, and say something directly to her. I didn't hear what he said and didn't mention it to anyone.

When the Judge sent the Jury back to continue deliberations, some jurors were standing up to leave. [The Juror], however, still sitting, looked over to [the Prosecutor] and simultaneously winked one eye and gave [the Prosecutor] a "high sign" or "o.k. sign" by encircling the thumb and pointer finger of his right hand and pointing the rest of the fingers upward.

At the exact point of this gesture, I told my daughter-in-law, Angela Lawhorne, what I saw. She told me to notify the defense attorney. I did so by tapping him on the shoulder and telling him what I saw.

Then, on April 6, 1998, the Court heard the defendant's motion for mistrial and received the testimony of the defendant's mother (Margaret A. Lawhorne), the defendant's wife (Angela Lawhorne), the Prosecutor and Special Agent Michael Talbert, who had attended trial. The testimony there showed the need to examine The Juror.

The defendant's mother and wife generally confirmed the events recited in their affidavits even though there were a few minor differences between their testimony on April 6 and the previous affidavits. (Apr. 6 Tr. at 8–28.)[10] On direct examination, the Prosecutor testified that she did not recall the Juror having said anything to her or gesturing to her. (Apr. 6 Tr. at 27–28.) On cross-examination, the Prosecutor acknowledged that the Juror, in fact, had made a gesture which she took to refer to her jewelry which was obtained from the company for whom the Juror worked.[11] The government's representative at trial, an agent of the Bureau of Alcohol, Tobacco and Firearms, did not recall either verbal communication or gestures, but acknowledged that they could have occurred without his knowledge. (Apr. 6 Tr. at 33–34.) Considering the foregoing, the Court continued the hearing until April 29, 1998 so that the Juror, whose conduct was at issue, could be examined under oath.

On April 27, 1998, Lawhorne submitted a memorandum in anticipation of the hearing at which the Juror was to be examined. In the April 27 pleading, Lawhorne noted that, at the April 6 hearing, there was evidence "which indicated that [the Juror] had at least one non-verbal communication with [the Prosecutor] while seated in the jury box, and may have had other verbal and non-verbal communications with [the Prosecutor]." (Def.'s Mem. Concerning Allegations Juror Bias at 1.) It was in this pleading that Lawhorne first asserted specific claims of juror dishonesty and actual bias to augment the February 2 mistrial motion that was based upon improper communication between the Prosecutor and the Juror.[12]

At the evidentiary hearing held on April 29, the Juror was examined under oath by the Court. The Juror recalled that, when the jury returned to the courtroom for the purpose of having a question answered, he said something to the Prosecutor "like 'hi' or something." (Apr. 29 Tr. at 8.)[13] The Juror could not recall exactly his conduct on March

---

**10.** The transcript of the April 6, 1998 hearing will be cited as Apr. 6 Tr. at ___.

**11.** The record does not explain the reason for the coincidence that on this particular day the Prosecutor was wearing the jewelry which she had obtained from the company for which the Juror worked. Counsel for both sides had access to the jury panel list several days before the trial and so the identity of potential jurors was known before the date of trial.

**12.** During the April 6 hearing, counsel for defendant raised a generalized claim of juror bias.

**13.** The transcript of the hearing on April 29, 1998 will be cited as Apr. 29 Tr. at ___.

**300**

20, 1997, but he testified that "[i]t would have been very limited if I had said anything." (*Id.*) The Juror was asked specifically whether he gave the "okay" or "high sign" and he responded "I wouldn't have made—I don't ever make a gesture like that." (*Id.*) He also testified that "my decision was not based on my relationship with [the Prosecutor]." (*Id.* at 9.)

On examination by the United States, the Juror recalled that the Prosecutor was wearing "a necklace and earrings, part of the product line I sell." (*Id.* at 11.) And, he testified that he pointed to the jewelry which the Prosecutor was wearing and made a gesture or acknowledged saying: "[h]ey, it looks good. You're wearing my product and it looks good." (*Id.* at 11.) He further explained that he was "happy to see she was wearing [the jewelry]." (*Id.*)

In response to further questions from the Court, the Juror said that the gesture which he made to the Prosecutor was a "thumbs-up sign" and was intended to be "a gesture showing my approval that she was wearing the product. I was glad that she was, and also it looked good on her, in a gesture like that." (*Id.* at 11.) According to the Juror that exchange occurred while "I was in sitting in the jury box" and "before anything ever started, I think." (*Id.* at 12.)

On examination by counsel for the defendant, the Juror was asked whether he may have said "hi" or something like that to the Prosecutor more than once and he responded: "I'm not ruling out the possibility I could have waved at her or something passing in the hall." (*Id.* at 12.) Nor would the Juror rule out the possibility that he had gestured to the Prosecutor at other times during the trial. In fact, the Juror said "[i]t's very possible" that he made such gestures or statements to the Prosecutor more than once during the proceeding. (*Id.* at 13.) [14]

In other words, the Juror, both verbally and with gestures, commented approvingly on the appearance of the Prosecutor and

demonstrated an affinity with her by virtue of the business relationship which, during voir dire examination, he said would not affect his ability to serve impartially. This very personal conduct may have occurred, according to the Juror, on several occasions during the trial.

In the face of such testimony, the Juror explained the answers which he had given during the voir dire examination on March 20, 1997 in the following way:

It was kind of—because I didn't really want to serve on the jury because I had a lot to do and it takes time out of my day, I knew that I would have said yes, it would affect [my decision] and I would not have had to serve, but I would have been lying, so I had to truthfully respond that my knowledge of [the Prosecutor] would not affect my discussion so I was maybe in a reluctant way—I wasn't all enthusiastic, 'No way,' you know, because I was kind of hoping. I was really expecting not to have to serve on the jury.

(*Id.* at 14.) After the Juror gave that testimony on April 29, the following exchange occurred between him and counsel for the defendant:

Question: Is that because *you thought your relationship might get you kicked off the jury?*

Answer: *Yes, sir.* I was very surprised I had to serve.

Question: Why did you feel that your relationship was such that it might disclude you from being a juror?

\* \* \* \* \* \*

Question: What in your mind made you think that perhaps a lawyer for the defendant or the Government may not want you to sit?

Answer: I thought that you [counsel for defendant] wouldn't want me to serve because you knew that I knew her, and *I would think that you would have guessed that because I knew her that I*

**14.** Examination during the April 29 hearing also disclosed that the Juror had conducted two "jewelry shows" in the Prosecutor's home, and that he expected to conduct another in the coming months. It was the Prosecutor who initially requested that the Juror provide the "jewelry shows" in her home. That information, of course, was disclosed in less detail during voir dire examination.

*might be inclined to be on her side*, on the prosecution side, and that's why, you know, *I thought for sure I wasn't going to have to serve.*

(*Id.* at 14–15) (emphasis added). Thus, even the Juror recognized at the outset that his relationship with the Prosecutor was such that it ought to prompt defense counsel to excuse him.

Some of the conduct on which this motion is founded was directed to the attention of counsel for the defendant immediately when it occurred.[15] The conduct observed by the defendant's mother and wife occurred after the jury had been out deliberating and had returned to receive answers to questions which they had asked during deliberations. The affidavit by the defendant's mother says that communications also occurred during the taking of evidence. The Juror says that gestures were made before the evidence was taken and in the hall during recesses. The Prosecutor recalled that gestures occurred before the taking of evidence, but is not sure of that. At no time, however, did the Prosecutor advise the Court or opposing counsel of these communications.

Counsel for the defendant represented that he "didn't pay any attention" to the information regarding this conduct at trial but said that he "later heard about it ... [a]s we were leaving the courthouse after the jury had left at 10:00 p.m." (*Id.* at 20.) According to the defense counsel: "[t]hat's the first time that it registered in my mind that was a complaint [the defendant's mother and wife] had, not during the trial itself." (*Id.* at 21.)

Counsel was more specific on April 6, when he represented to the Court that:

Mrs. Lawhorne did tap me on the shoulders during the trial itself to tell me about this, tell me about this problem. I believe she did that two times. It didn't register

with me. I was in the emotion of the moment, and so I did not raise it at trial. She again told me about it as we left the courtroom that evening.

And, again, it wasn't until they wrote [presumably the January 12, 1998 letter] that I thought it worthy to bring forward. I let that slip, Judge. It somehow came in one ear and out the other as everything was happening and I did not raise it.

(Apr. 6 Tr. at 6–7.) Asked "[w]hen did you learn of this circumstance?", counsel responded: "[t]he facts of all of it came to my mind just about the time that they wrote to you, Judge." (*Id.* at 7.)

### DISCUSSION

The defendant's MOTION FOR MISTRIAL BASED UPON IMPROPER CONTACT BETWEEN A GOVERNMENT PROSECUTOR AND A JUROR AT THE DEFENDANT'S TRIAL was filed on February 2, 1998. It does not cite the rule under which it was filed. However, in a pleading dated April 24, 1998 and filed on April 27, 1998, Lawhorne argues that the motion should be regarded as one for new trial under Fed. R.Crim.P. 33. In the April 27 pleading, Lawhorne takes the position that his right to a new trial first manifested itself at the April 6 hearing because, during that hearing, the Prosecutor first admitted the communications with the Juror that warrant a new trial. On April 6, counsel for Lawhorne made a verbal motion for a new trial based on juror misconduct as well as improper communication. (Apr. 6 Tr. at 36.) Before then, according to the April 27 pleading, the only information known to the defense counsel was that which was provided by the defendant's mother and wife respecting the allegedly improper communication at the prosecutorial counsel table in the form of an "okay" sign delivered by the Juror to the Prosecutor.[16]

---

15. This is demonstrated in the letters sent to the Court on January 12, 1998 by the defendant and his mother, in the affidavits filed with the defendant's pleadings on February 2, 1998, and in the testimony of the defendant's mother and wife on April 6, 1998.

16. Specifically, the April 27 pleading argues that the information to support a new trial:

was not fully developed until the Court's hearing of April 6, 1998, wherein [the Prosecutor] admitted on cross-examination that [the Juror] had a non-verbal communication with her in that he smiled at her and gestured to some jewelry that she was wearing and made a hand signal to the jewelry, indicating that it was one of the pieces with which he and she might

Notwithstanding its misnomer as a motion for mistrial, the motion filed on February 2 is, in form and substance, a motion for new trial, made pursuant to Fed.R.Crim.P. 33, which, in pertinent part, provides:

> The court on motion of the defendant may grant a new trial to that defendant if required in the interest of justice.... A motion for new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment, but if an appeal is pending the court may grant the motion only on remand of the case. A motion for new trial based on any other grounds shall be made within 7 days after verdict or finding of guilty or within such further time as the court may fix during the 7–day period.

Although Rule 33 permits a district court to grant a new trial "if required in the interest of justice," a motion for new trial based on any ground other than "the ground of newly discovered evidence" must be made within seven days after verdict or at such other time as permitted by court order within that seven-day period. A motion for new trial by virtue of juror bias or other juror-related problems is a motion falling within the ambit of the phrase "in the interest of justice." [17] Allegations of juror misconduct do not, however, *per se* fall within the reach of the newly discovered evidence provision of Rule 33 under which a motion for new trial may be made before or within two years after final judgment. Apparently in recognition of that circumstance, Lawhorne, by the April 27 pleading, has recast his February 2 motion for mistrial as a motion for new trial on the ground that there is newly discovered evidence of juror misconduct.

It is against the foregoing factual and procedural background that Lawhorne's motion for new trial will be considered.

## I. Threshold Considerations

### A. Jurisdiction to Entertain the Motion

The threshold problem with Lawhorne's motion is that it was filed approximately six weeks after he noted an appeal to the United States Court of Appeals for the Fourth Circuit (*see* Notice of Appeal, Pleading Number 46, Dec. 18, 1997). And, one of the issues presented for appeal was: "whether the jury was tainted by virtue of a juror having some kind of conversation with the prosecutor during trial." [18] Giving Lawhorne the benefit of every doubt, the motion for new trial was filed on February 2, 1998. Accordingly, if, as Lawhorne here urges, his motion for new trial is based on the ground of newly discovered evidence respecting the partiality of a juror, then it is timely because it was filed within two years after final judgment. However, under the newly discovered evidence facet of Rule 33, this Court may grant the motion only on remand because, at the time the motion was filed, an appeal was pending in the Court of Appeals.[19]

Notwithstanding the provisions of Rule 33, this Court recently has been informed that the Court of Appeals is holding further action on the appeal in this case until after this Court rules on the motion for new trial.[20] Accordingly, it is necessary for this Court to decide the motion, notwithstanding the provisions of Rule 33 to the contrary.

---

> have been familiar through his sales of that line in [the Prosecutor's] home.
>
> (Def.'s Mem. Concerning Allegations Juror Bias at 2.)

**17.** *See* 3 Charles Alan Wright, *Federal Practice & Procedure* § 554, at 249–50 (2d ed.1982); *see also United States v. Gray*, 47 F.3d 1359 (4th Cir. 1995). The decision in *United States v. Smith*, 62 F.3d 641 (4th Cir.1995), however, might call this commonly held perception into doubt in this Circuit. *See infra* Part II.B.

**18.** The supplemental sheet to question G of the December 22, 1997 docketing statement addressed "[i]ssues to be raised on appeal."

**19.** Some district courts have approached this problem by hearing the motion and then certifying the inclination to grant a new trial upon remand. *See* 3 Wright, *supra*, § 557, at 339.

**20.** On February 10, 1998, the Court of Appeals entered an Order granting Lawhorne's motion for stay of his appeal until after the Court decided the motion for new trial. It was not until recently that this Court was made aware of the February 10 Order issued by the Court of Appeals.

## B. Waiver

■ As explained above, Lawhorne's counsel was aware, on March 20, 1997, of some of the basic conduct (*i.e.*, communications between the Prosecutor and the Juror) that forms the basis of Lawhorne's motion.[21] The United States contends that this fact alone constitutes a waiver of any right to a new trial.

In *Gray v. Hutto*, 648 F.2d 210 (4th Cir. 1981), the Fourth Circuit held that the defendant had waived his right to a new trial where his attorney learned of alleged juror misconduct while the case was still in progress, but deliberately delayed bringing the matter to the attention of the trial court until after the verdict. *See id.* at 211–12; *see also United States v. Gootee*, 34 F.3d 475, 479 (7th Cir.1994). Also, in *United States v. Breit*, 712 F.2d 81 (4th Cir.1983), the Fourth Circuit explained, in unequivocal terms, that "[a] defendant who remains silent about known juror misconduct—who, in effect, takes out an insurance policy against an unfavorable verdict—is toying with the court." *Id.* at 83. In *Breit*, the district court also found that the lawyer made a deliberate decision to remain silent about the juror's conduct. For that reason, the Court of Appeals sustained the denial of a motion for new trial.

Although it is rather clear that counsel for Lawhorne (who was aware from voir dire that the Juror had a business relationship with the Prosecutor) was told during the trial of information surrounding possible juror misconduct, counsel never brought that information to the Court's attention. Here, the record is that, until after the trial, the defense counsel paid no attention to the information made known to him at trial. Even then, he did not pursue it or raise it in the first post-trial motion filed in June 1997 and argued in August 1997.

The Court in no way intends to suggest that Lawhorne himself is "toying with" the judicial process. Nor does the Court consider that Lawhorne's counsel made a conscious and deliberate decision not to promptly bring this serious matter to the attention of the Court when it occurred. Rather, the Court notes that defense counsel is new to the bar and erred in failing to do what is expected of counsel. Unlike *Gray* and *Breit*, there was no deliberate decision to forego a known right. Thus, although the error may had been forfeited, it was not waived. *See United States v. Olano*, 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (citing *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)).

■ Of equal importance is the fact that the Prosecutor knew about the communications and failed to disclose them to her adversary or to the Court. Under these circumstances, the United States is estopped by its own conduct from interposing a claim of waiver. For the foregoing reasons, the Court declines to find a waiver.

## II. The Merits of the Motion

### A. Is The Factual Information On Which The Motion Relies Evidence Under Rule 33?

■ Lawhorne's theory that he is entitled to a new trial because of newly discovered evidence of juror misconduct runs afoul of the strictures recently imposed on Rule 33 by the Fourth Circuit in *United States v. Smith*, 62 F.3d 641 (4th Cir.1995). In *Smith*, the putative newly discovered evidence was information supporting an ineffective assistance of counsel claim.[22] After finding that information of that sort was not " 'evidence' within the meaning of Rule 33," *id.* at 648,[23]

21. *See supra* n. 15 and accompanying text. The proper standard for making this factual determination is proof by a preponderance of the evidence. *See United States v. Breit*, 712 F.2d 81, 83 (4th Cir.1983).

22. The alleged ineffectiveness arose out of a conflict of interest. The Fourth Circuit held that Smith's motion under Rule 33 was not timely. *See id.* at 648–60. Although counsel for Law-

horne may have been ineffective, that is not the ground for the new trial motion here.

23. Several other circuits also have held that information showing the ineffective assistance of counsel is not "newly discovered evidence" within the meaning of Rule 33. *See Smith*, 62 F.3d at 649 n. 4, 3 Wright, *supra*, § 557, at 337. However, those courts have not gone so far as to hold that the information about the ineffectiveness is

the Fourth Circuit went on to reject the motion for new trial for the reason that Rule 33's two-year window is available only if the new evidence was of the sort which was admissible at trial. In that regard, the Court of Appeals held:

> Third, the very language of the rule suggests that, in order for a defendant's motion to come within the two-year time limit, *that which is 'newly discovered' must be evidence* that would be *admissible* were a new trial granted. Otherwise, the rule would more naturally refer to 'newly discovered facts' or 'newly discovered information.'

*Smith*, 62 F.3d at 649 (emphasis added).

Although *Smith* puts this circuit in conflict with the more relaxed view of Rule 33 taken elsewhere,[24] it is clearly binding here. And, *Smith* is fatal to Lawhorne's newly discovered evidence theory because that which is newly discovered here—juror communications or juror misconduct—would not be admissible were a new trial granted.

It is arguable, however, that because *Smith* involved a claim of newly discovered evidence of ineffective assistance of counsel, an issue not presented at this juncture in Lawhorne's case, the above-referenced discussion in *Smith* is *dicta* that is restricted to cases only involving newly discovered facts about ineffective assistance of counsel. That possibility having been posited, it must be rejected and thus *Smith* forecloses Lawhorne's newly discovered evidence theory as a way to bring his plea for relief from error within the two-year period of Rule 33, rather than the otherwise applicable seven-day period.

And, that would be the end of the Rule 33 inquiry under ordinary circumstances.[25] However, the language in *Smith* is at odds with the less restrictive view of Rule 33 taken in other courts and, if it is *dictum*, then it would be necessary to assess the merits of Lawhorne's Rule 33 motion. For

that reason, and because Lawhorne is incarcerated, it is appropriate to turn to the merits of his motion so as to avoid further delay.

## B. The Rule 33 Test And Its Application Here

■ If *Smith* does not foreclose Lawhorne's motion, then he must satisfy each aspect of this circuit's five-part test for assessing motions for a new trial based on newly discovery evidence:

(1) the evidence must be, in fact, newly discovered, *i.e.*, discovered since the trial;

(2) facts must be alleged from which the Court may infer diligence on the part of the movant;

(3) the evidence relied on must not be merely cumulative or impeaching;

(4) the evidence must be material to the issues involved; and

(5) the evidence must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

*See United States v. Christy*, 3 F.3d 765, 768 (4th Cir.1993); *United States v. Chavis*, 880 F.2d 788, 793 (4th Cir.1989); *United States v. Bales*, 813 F.2d 1289, 1295 (4th Cir.1987) (*citing Mills v. United States*, 281 F.2d 736, 738 (4th Cir.1960)). Unless the answer to each of these inquiries is in the affirmative, a new trial is not appropriate. *See Chavis*, 880 F.2d at 793.

### 1. Newly Discovered

■ First, the evidence must truly be "newly discovered." Where the defendant had knowledge of the evidence in question at the time of the trial, before the verdict, courts uniformly have held that Rule 33's more generous timing mechanism is unavailable. *See, e.g., United States v. McKinney*, 952 F.2d 333, 335 (9th Cir.1991). Even if the

---

not "evidence." Rather, those decisions focus on whether the evidence is "newly discovered."

**24.** *See* 3 Wright, *supra*, § 557, at 337 (commenting that "the phrase 'newly discovered evidence' is often used to describe what can only be thought of as evidence in a very loose" sense and

observing that "newly discovered evidence need not relate only to the question of guilt or innocence, but may be factual evidence that is probative of another controlling issue of law.")

**25.** *See Karsten v. Kaiser Found. Health Plan*, 36 F.3d 8, 11 (4th Cir.1994).

defendant is in possession of the evidence before trial, but does not realize its relevance, the result is the same: the evidence is not "newly discovered" for purposes of a motion for new trial. *See United States v. Jaramillo,* 42 F.3d 920, 925 (5th Cir.1995).

In this case, Lawhorne's mother and wife observed, at least, some of the applicable juror misconduct on the date of trial, during the trial, during the deliberative process and before the jury had returned its verdict. The record also shows that, almost immediately after observing the alleged misconduct, the defendant's mother communicated it to counsel for Lawhorne.

Thus, the basic conduct (communication between the Juror and the Prosecutor) on which the new trial motion is based, having been known before the verdict was returned, cannot qualify as evidence "newly discovered" since the trial. Lawhorne seeks to escape the consequence of that rather obvious conclusion by arguing that his counsel did not learn until the April 6 hearing that the Prosecutor had been aware of the allegedly improper communication.

It is not readily apparent why the Prosecutor's post-trial confirmation of a fact learned by counsel during trial converts that fact into evidence "newly discovered" after the trial. In reality, the argument is that counsel did not appreciate that the defendant's evidence (from his wife and mother) could be corroborated by the testimony of the Prosecutor. That certainly does not make the basic evidence qualify as newly discovered.

The more troublesome issue respecting newly discovered evidence is not even addressed by Lawhorne or the United States. The significant question is whether the revelations made by the Juror on April 29 qualifies as newly discovered. Beyond question, the Juror revealed far more extensive and more significant communications with the Prosecutor than Lawhorne's wife and mother witnessed at trial, or than that to which the Prosecutor testified on April 6. In sum, the Juror disclosed several communications, verbally and by signal, between himself and the Prosecutor, and he admitted that his relationship with her was such that he expected to be challenged.

More importantly, on April 29, the Juror, for all practical purposes, confessed to facts which showed that, contrary to his assertions at voir dire and on April 29, he was not able to put aside his business relationship with the Prosecutor. Indeed, that relationship was so important that he signaled it before the taking of evidence and during deliberations, and perhaps at other times.

That testimony on April 29 was, in fact, "newly discovered evidence" and it is highly relevant to whether the Juror truthfully or completely answered the original voir dire questions and whether his relationship created actual bias. Therefore, the most important support for Lawhorne's motion qualifies as newly discovered.

### 2. The Exercise of Diligence

■ Second, it is necessary to determine whether there has been diligence on the part of the defendant. "Diligence" means ordinary diligence, not the highest degree thereof; and diligence usually is determined by taking into account the composite knowledge of the defendant and his counsel. *See* 3 Wright, *supra,* § 557, at 327–29.

However, it has been held that "a defendant raising a constitutional claim in a new trial motion based on new evidence need not excuse his lawyers' failure to discover the evidence at the time of trial with a showing of 'due diligence.'" *United States v. Torres,* 115 F.3d 1033, 1037 (D.C.Cir.1997) (citing *Marshall v. United States,* 436 F.2d 155, 159 n. 1 (D.C.Cir.1970)). The Fourth Circuit does not appear to have ruled on this exception to the diligence component of the standard test for securing a new trial under Rule 33. Nor does it seem to have been adopted beyond the District of Columbia Circuit.

But, if ever there was a case for freeing a defendant from the consequences of a counsel lacking in diligence, it can be made here because Lawhorne's mother told counsel about the conduct when it happened, and she raised it again immediately after the verdict when Lawhorne, his family and counsel were departing the courthouse. And, it is undisputed that counsel did nothing with this information until nine months later when the

Docketing Statement was filed on appeal. In other words, in this case it is undisputed that the defendant acted with diligence to place the information known to him in the hands of someone whom he reasonably could have expected would know how to put it to use in protecting his right to trial by an impartial jury.[26]

Furthermore, the issue here is of constitutional import, implicating, as it does, Lawhorne's Sixth Amendment rights. *See infra* Parts II.B.5 & III. Hence, under the *Torres/Marshall* rationale, a factual and legal predicate exists for excusing Lawhorne from the undisputed, and inexcusable, lack of diligence exhibited by his counsel.[27] However, there is reason to believe that the Fourth Circuit might not follow the *Torres/Marshall* rationale because counsel's lack of diligence is, as the *Marshall* court noted, also subject to collateral attack, *see Marshall*, 436 F.2d at 159, and, in *Smith*, the Fourth Circuit concluded that the availability of a collateral attack upon the inadequate assistance of counsel was one of the reasons why information about the ineffectiveness of counsel was not subject to redress under the newly discovered evidence facet of Rule 33. *See Smith*, 62 F.3d at 649.

█ On the other hand, the narrow issue presented by the diligence component of the Rule 33 test is not ineffectiveness of counsel as a ground for relief, but whether a defendant who has acted diligently in apprising counsel of the basis for a challenge to the constitutional validity of his conviction should be held accountable for his lawyer's lack of diligence in protecting the defendant's constitutional rights. The decisions in *Torres* and *Marshall* teach that the answer is no. And,

considering that the right to trial by an impartial jury is a bedrock principle of our criminal justice system, it is appropriate to apply, in this limited circumstance, the *Torres/Marshall* rationale in this case.[28]

Finally, the undisclosed knowledge of the Prosecutor respecting the juror communications is another reason for ameliorating the harshness of Rule 33's diligence-of-counsel requirement in this case. If the Juror' factual testimony is to be believed (and there is no reason not to do so, considering that it is corroborated by Lawhorne's mother and wife), then the Prosecutor knew of the Juror's conduct. Indeed, she confirmed on cross-examination on April 6 that she was aware of some of that conduct. Thus, unlike the circumstances presented by most lack of diligence cases, the prosecution was not at all in the dark about the prospect of a ground for a new trial. Had the Prosecutor simply presented what she knew to counsel for the defendant or the Court when she claims to have become aware of it (before the presentation of evidence), the ensuing difficulty could have been avoided because the Juror could have been excused and replaced by the alternate. At worst, the trial would have been delayed a day and presented to a new jury.

And, if as seems to have been the case, the communications took place on several occasions, it is simply unfair to hold Lawhorne accountable for his counsel's failure to raise and pursue what, in essence, the Prosecutor was obligated to disclose. For the foregoing reasons, Lawhorne has satisfied the second facet of the Rule 33 test.

**26.** Under Local Rule 83.5 and Local Criminal Rule 24, counsel could not have interviewed the Juror after trial without leave of court. Of course, leave of court would have been granted if the matter of the communication had been brought to the attention of the Court.

**27.** No doubt, counsel should have raised the issue with the court during trial, or at the latest, when the first new trial motion was filed in June 1997 on the schedule set on March 20.

**28.** If, of course, counsel's lack of diligence is attributable to Lawhorne, then the diligence facet of the Rule 33 test has not been met for, without doubt, ordinary diligence would have required

counsel to have raised the matter either at trial or when the first new trial motion was filed in June 1997. Counsel failed to do so. Indeed, counsel never raised it with this Court; the whole topic came to the Court's attention in the form of letters from Lawhorne and his mother dated January 12, 1998.

Given Lawhorne's mental state from October 30, 1997 until January 12, 1998, *see supra*, nn. 7–9 and accompanying text, it seems that he acted with reasonable promptness in directing the matter to the attention of this Court when it became obvious that his counsel had not done so.

### 3. The Cumulative/Impeaching Factor

The third factor is whether the newly discovered evidence is cumulative or impeaching. Notwithstanding the information provided during the voir dire examination, the information on which Lawhorne bases his motion is neither cumulative nor impeaching. Rather, the conduct in which the Juror engaged did not occur until long after the completion of voir dire, and hence it is not cumulative of the information available to counsel during voir dire. Although some of the answers given by the Juror do tend to impeach the profession of lack of bias which he gave on voir dire, his conduct during the trial and the jury's deliberation was substantive in nature and therefore cannot be considered merely impeaching within the meaning of Rule 33 jurisprudence.

### 4. Materiality

Clearly, the testimony given on April 6 by the Prosecutor and on April 29 by the Juror is material to resolving the issue of improper communications. And, it is the key to the issues of juror dishonesty and actual bias.

### 5. The Probability of Acquittal

The final element is whether the newly discovered evidence, in a new trial, would probably produce an acquittal. Of course, the fact pattern presented here does not lend itself to analysis of that sort because the "new evidence" at issue would never be presented to a jury.[29] The pertinent question, in the context of this case, then, is whether the "new evidence" likely would have produced a mistrial or new trial if it had been promptly presented.

Neither the parties nor the Court have unearthed decisions instructing on how to assess the fifth component of the new trial test under the factual circumstances which form the basis for the new trial request presented in this case. Nonetheless, it appears that assessment of that component is materially informed by the following alternative frameworks: (1) the controlling rule in this circuit for assessing alleged improper juror contact set forth in *United States v. Cheek*, 94 F.3d 136, 140 (4th Cir.1996); (2) the standard for assessing allegations of juror dishonesty during voir dire enunciated in *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984); and (3) a general Sixth Amendment challenge to the verdict by virtue of the partiality of a juror based upon circumstances occurring outside the voir dire examination.[30] Because these three standards are equally instructive, the fifth element of the test for resolving new trial motions—whether the "new evidence" would have produced a mistrial or new trial—will be considered under each framework.

### a. The *Cheek* Test for Analyzing Allegations of Improper Juror Contact

Under *United States v. Cheek*, the party attacking the verdict bears the initial burden of introducing competent evidence that there were extrajudicial communications or contacts and that they were "more than innocuous interventions."[31] Although, as the Government argues, some of the communications at issue occurred in open court, they were nonetheless private communications between the Juror and the Prosecutor because they were not readily visible to the Court or to defense counsel.[32]

The facts in this record foreclose a finding that the communication was a mere innocuous intervention. The signaling, although uninvited by the Prosecutor, demonstrated an affinity of the Juror for the Prosecutor of the type which should not exist in any trial.

---

**29.** The analysis of the fifth element of the new trial test, of course, is made assuming that *Smith* is limited to claims of new information of ineffectiveness of counsel or is *dicta*. *See supra* Part II.A. If *Smith* controls here, there is no evidence at all and Rule 33 simply does not apply.

**30.** The parties originally briefed this case only in the context of the first possible framework for analysis. However, the issues raised in Lawhorne's April 27 pleading and at the April 29 hearing suggest the latter two as alternative bases for Lawhorne's claimed right to a new trial.

**31.** The motion in *Cheek* was not based on the newly discovered evidence provision of Rule 33.

**32.** According to the Juror, some communication may have been in the hallways.

Either before the start of the evidence (if the Juror's somewhat indefinite recollection is to be believed) or during the trial and later during deliberations when the Court was answering crucially important questions having to do with the key element in the case (possession and control of the weapon at issue), or perhaps at both times, the Juror gave the Prosecutor a universally recognized signal of victory.[33] Moreover, the Juror indicated that it was entirely possible that he had additional communications with the Prosecutor, and, whatever the gesture was, it evinced an affinity much stronger than that disclosed by the Juror in the voir dire examination. Finally, the nature of the communications undercut the Juror's voir dire response that his business relationship with the Prosecutor would not affect his ability to be impartial.

■ Where, as here, the communications cannot be characterized as innocuous, there arises a presumption of prejudice. *See Cheek*, 94 F.3d at 141; *Haley v. Blue Ridge Transfer Co.*, 802 F.2d 1532, 1537 n. 9 (4th Cir.1986). The burden then shifts to the United States to establish that there exists no reasonable possibility that the jury's verdict was influenced by the improper communication. The Fourth Circuit has described this as a "heavy burden." *Haley*, 802 F.2d at 1537.

That burden is especially difficult to meet where, as here, the prosecution's case turned on the credibility of two key government witnesses whose testimony was inconsistent. The burden is virtually impossible to meet where the questions submitted by the jury and the polling of the jury established that the key issues were extremely close ones and that the jury evinced great difficulty in reaching its decision.

It is also clear from the polling of the jury that, after having signaled affinity with, approval of and support for the Prosecutor, the Juror voted for conviction. Although the Juror swore under oath that his verdict was not affected by his business relationship with the Prosecutor, there is, in the objective facts, very real evidence that the verdict of guilty was not free from influence by the extrajudicial communication.

That assessment is underscored by the failure of the Prosecutor to bring those communications to the attention of her adversary or the Court. Indeed, if the communications had been perceived as innocuous by the Prosecutor, there would be no reason for her not to have directed them to the attention of the Court and defense counsel. That the Prosecutor failed to do so suggests strongly that she saw them as less than innocuous,[34] especially where, as happened here, defense counsel had once before admonished the Prosecutor about a communication with another juror concerning the dress worn by the Prosecutor.

Therefore, if the fifth facet of the test for a new trial under Rule 33 is analyzed as a *Cheek* inquiry, the Court finds that a mistrial or new trial would have been produced if the matter had been timely presented. However, to stop the analysis here would be remiss because the *Cheek* test generally is reserved for assessing the effect of extra-judicial communication between a third party and a juror. *See, e.g., Cheek*, 94 F.3d at 141; *Stockton v. Commonwealth of Virginia*, 852 F.2d 740, 745 (4th Cir.1988). This case presents a juror-initiated communication with a prosecutor and that fact, and the nature of the communications, requires assessment of juror bias and partiality, rather than the danger of outside influence. So it is to the jurisprudence respecting juror bias that the Court now turns for further instruction in

---

**33.** The "thumbs-up" signal dates back to the times of Ancient Rome when the crowd voted to allow the gladiator to live or die by turning thumbs up or down, respectively. Thumbs-up has been symbolic of victory ever since. *See generally Gladiators*, <http://www.ancientsites.com/as/er/gladiators.html$ (visited Oct. 30, 1998).

**34.** The United States suggests that the failure of the Prosecutor to take such action demonstrates

how lacking in significance the communications were. That assertion turns on its head the Prosecutor's duty to assure a fair trial for it is not reasonable to construe these several verbal and non-verbal communications as innocuous coming, as they did, on more than one occasion and signaling, as they did, an affinity with the Prosecutor based on a relationship which the Juror had sworn would not influence his decision or compromise his impartiality.

the Rule 33 inquiry presented by the facts here.

### b. Juror Dishonesty on Voir Dire

█ An alternative approach to assessing whether the "new evidence" of the Juror's demonstrated affinity and communication with the Prosecutor would have produced a mistrial or new trial for Rule 33 purposes is to determine whether the evidence provides Lawhorne with a claim of juror dishonesty during voir dire.

█ The Supreme Court has enunciated a two-part test to determine whether a defendant alleging juror dishonesty during voir dire is entitled to a new trial:

> [T]o obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause.

*McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 556, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984). At the April 29 hearing, Lawhorne contended that the Juror responded dishonestly when, at the voir dire, he answered "It shouldn't affect it" to an inquiry from the Court whether the relationship the Juror described with the Prosecutor would prevent him from giving a fair trial and from basing his decision only on the evidence in the case. According to Lawhorne, a new trial is appropriate because the Juror's actual conduct during the proceedings demonstrated that his statement during voir dire was a falsehood when made.

The issue, then, is whether any "new evidence" assists Lawhorne in establishing the first aspect *McDonough*. Crucial to this inquiry is a delineation of the precise contours of this first element. May a defendant establish a *McDonough* claim by demonstrating that a juror gave a subjectively honest answer that later proved to be incorrect, or is *McDonough* limited to challenges based on deliberately dishonest voir dire responses

measured at the time of the response?[35] If only the latter, then Lawhorne faces difficulty proving his entitlement to a new trial under *McDonough*.

The answer ultimately depends upon the correct interpretation of the Supreme Court's decision in *McDonough*. Chief Justice Rehnquist's plurality opinion conditions the grant of a new trial on a showing that the juror "failed to answer honestly." 464 U.S. at 556, 104 S.Ct. 845. A party cannot satisfy this test merely by demonstrating that a juror provided a "mistaken, though honest, response to a question." *Id.* at 555, 104 S.Ct. 845. Two justices, however, concurred only in the judgment in *McDonough*, stating that "[o]ne easily can imagine cases in which a prospective juror provides what he subjectively believes to be an honest answer, yet that same answer is objectively incorrect and therefore suggests that the individual would be a biased juror in the particular case." *Id.* at 559, 104 S.Ct. 845 (Brennan, J., joined by Marshall, J., concurring in judgment). Three other justices took the view that "regardless of whether a juror's answer is honest or dishonest," a defendant may be entitled to relief if he "demonstrate[s] actual bias, or in exceptional circumstances, that the facts are such that bias is to be inferred." *Id.* (Blackmun, J., joined by Stevens and O'Connor, JJ., concurring). Thus, when reduced to an exercise in vote-counting, a cloud surrounds the proper interpretation of *McDonough* and the application of that decision to these facts.

The Fourth Circuit recently recognized this ambiguity, but expressly declined to resolve it, holding instead that a state habeas corpus petitioner's *McDonough* claim failed under either interpretation. *See Fitzgerald v. Greene*, 150 F.3d 357 (4th Cir.), *cert. denied*, ―― U.S. ――, 119 S.Ct. 389, 142 L.Ed.2d 321 (1998). In *Fitzgerald*, the Fourth Circuit did, however, highlight what it perceived to be a split among the circuits concerning whether the correct interpreta-

---

**35.** Of course, if Lawhorne's new evidence establishes dishonesty with respect to the question concerning the Juror' ability to be impartial, then the second part of the *McDonough* test would not stand as an impediment to relief. *See McDon-* *ough*, 464 U.S. at 554, 104 S.Ct. 845 ("Demonstrated bias in the responses to questions on voir dire may result in a juror being excused for cause.").

tion of *McDonough* incorporates the view of the concurring opinions that a juror's dishonesty is not a necessary predicate to obtaining a new trial. *Id.* at 364 n. 3 (collecting authority). To justify its abstention on this issue, the Fourth Circuit explained that:

> The only circumstance in which this distinction is relevant is when the prospective juror answers a question honestly, but incorrectly such that a "correct response would have provided a valid basis for a challenge for cause." When, as here, the prospective juror's answer was not just honest, but also correct, the second part of the *McDonough* test is necessarily rendered moot.

*Id.* (emphasis added) (citation omitted).

That very distinction is decisive in this case. Several courts have held that Chief Justice Rehnquist's opinion provides the controlling rule, and that "the *McDonough* test is directed at intentionally incorrect responses." *Gonzales v. Thomas,* 99 F.3d 978, 984 (10th Cir.1996), *cert. denied,* 520 U.S. 1159, 117 S.Ct. 1342, 137 L.Ed.2d 501 (1997); *accord United States v. Wright,* 119 F.3d 630, 636 (8th Cir.1997); *United States v. White,* 116 F.3d 903, 930 (D.C.Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 390, 139 L.Ed.2d 305 (1997). According to those decisions, the only pertinent inquiry is whether the juror honestly believed that the response provided during the voir dire examination was truthful. *See, e.g., Gonzales,* 99 F.3d at 984–85.

The record in Lawhorne's case establishes that, at the time of the voir dire, the Juror honestly believed that his response to the Court's inquiry was true. The Juror himself provides the best evidence of his perception of his state of mind, and he has twice represented to the Court that he answered honestly during voir dire. First, the Court engaged the Juror in a colloquy wherein the scope of his business and social acquaintance with the Prosecutor was placed on the record, and the Juror stated that those facts "shouldn't affect" his judgment. (Tr. at 11.) [36] Thus, Lawhorne cannot make the argument considered dispositive by some other courts: that the Juror deliberately concealed facts concerning the nature of his relationship with the Prosecutor during the voir dire. *See, e.g., Zerka v. Green,* 49 F.3d 1181, 1184–86 (6th Cir.1995). In addition, The Juror's frank explanation of his voir dire response at the April 29 hearing provides further uncontradicted evidence of his state of mind on the morning of March 20, 1997:

> I knew that if I would have said yes, it would affect it and I would not have had to serve, but I would have been lying, so I had to truthfully respond that my knowledge of her would not affect my discussion.

(Apr. 29 Tr. at 14.) Accordingly, the Court finds that, if Chief Justice Rehnquist's opinion in *McDonough* provides the controlling rule of law, then Lawhorne cannot establish the fifth prong of the standard for a new trial under Rule 33.

The Fourth Circuit intimated in *Fitzgerald,* however, that a party may be able to seek relief under *McDonough* without establishing juror dishonesty during voir dire. *See Fitzgerald,* 150 F.3d at 364 n. 3. If that is the rule, then a *McDonough* claim may lie because here the Juror's profession of impartiality may have been subjectively honest, but his subsequent conduct proves objectively that his perception, and hence his answers on voir dire, were incorrect. In addition to the separate opinions in *McDonough,* the decision in *Fitzgerald* cited decisions of the First and Sixth Circuits to support the prosect that *McDonough* affords relief even absent a threshold showing of dishonesty. *See id.* (citing *Zerka v. Green,* 49 F.3d 1181 (6th Cir.1995) and *Amirault v. Fair,* 968 F.2d 1404 (1st Cir.1992)). Study of those decisions, however, suggests that *Fitzgerald* may have perceived a split in the circuits when none exists. For example, the separate opinions in *McDonough* do not seem to urge an alternative reading of the plurality opinion; rather, they seem merely to emphasize that the Chief Justice's opinion did not foreclose a further determination on the question of juror bias, even where a juror had been honest during voir dire. And, clearly, it does not.

---

**36.** The Court is wary that the Juror's profession of impartiality ("it shouldn't affect it") is less than definitive. For purposes of this analysis, however, the Court assumes that the statement in issue constituted an affirmative denial of partiality.

Also, the decisions which *Fitzgerald* described as interpreting *McDonough* to encompass "honest but incorrect" voir dire responses likewise do not appear to go that far. To the contrary, both *Amirault* and *Zerka* go to great lengths to explain that, if a juror has responded to voir dire with subjective honesty, "*McDonough* would not apply, but rather the pre-existing rule requiring proof of actual bias." *Zerka,* 49 F.3d at 1186 n. 7; *see Amirault,* 968 F.2d at 1405.

Moreover, the facts in those cases are not materially different than those appearing in decisions that supposedly require a threshold showing of dishonesty for relief under *McDonough.* For example, even though the Tenth Circuit has held that *McDonough* is "directed at intentionally incorrect responses," *Gonzales v. Thomas,* 99 F.3d 978, 984 (10th Cir.1996), the court also explained that:

> Just because a juror responds honestly, but incorrectly, to a voir dire question does not foreclose the possibility of bias.... Though a defendant cannot prevail under *McDonough* in such a situation—because the juror has not been dishonest—we believe the doctrines of actual and implied bias provide defendants adequate Sixth Amendment protection in such cases.

*Id.* at 985 n. 4 (citations omitted) (rejecting a *McDonough* claim based on a juror who did not disclose prior victimization when asked). Similarly, the Fourth Circuit observed, in *Fitzgerald,* that "[f]ailure to satisfy the requirements of *McDonough* does not end the court's inquiry, however, when the [defendant] also a general Sixth Amendment claim challenging the partiality of a juror based upon additional circumstances occurring outside the voir dire." 150 F.3d at 362–63.

■ In any event, any dispute over the proper interpretation of *McDonough* appears largely to be a semantic one because a party seeking to challenge a jury verdict on grounds of impartiality or bias of a juror can proceed on alternative theories: a *McDonough* claim of juror dishonesty, or "a general

Sixth Amendment claim of juror bias." *Id.* at 364. To the extent that it is necessary to define the precise contours of the former, it appears that, to establish a *McDonough* claim alleging juror dishonesty during voir dire, the complaining party must demonstrate that the juror gave a subjectively dishonest response. Support for this conclusion is found in a plain reading of the plurality opinion in *McDonough*[37] bolstered by reading the concurring opinions to mean only that *McDonough* does not foreclose other avenues of inquiry such as a Sixth Amendment challenge. That also seems to be consistent with the pre-*McDonough* decision in *United States v. Bynum,* 634 F.2d 768 (4th Cir.1980), wherein the Fourth Circuit ordered new trials in two criminal cases only after considering evidence that established that a juror's failure to disclose information during voir dire was "deliberately untruthful," rather than merely inadvertent. Because the record here does not establish the Juror's deliberate untruthfulness during voir dire, any "new evidence" that Lawhorne may have does not provide him with a *McDonough* claim that satisfies the fifth aspect of a Rule 33 motion.

### c. Sixth Amendment Claim of Juror Bias

"Though the test articulated by the Supreme Court in *McDonough* serves as the primary means for assessing cases where a juror allegedly responds untruthfully during voir dire, it does not provide the exclusive analysis for such cases." *Gonzales,* 99 F.3d at 985. When the challenge is to the partiality of a juror based upon circumstances occurring outside of voir dire, the Fourth Circuit has held that a defendant may also assert a "general Sixth Amendment claim of juror bias." *Fitzgerald,* 150 F.3d at 364. The remedy for such an allegation is a hearing in which the defendant has the opportunity to prove actual bias. *See Fitzgerald,* 150 F.3d at 364 (citing *Smith v. Phillips,* 455 U.S. 209, 215, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)).[38]

---

37. Indeed, the Supreme Court, in *McDonough,* reversed a decision of the Tenth Circuit that contained language to the contrary. *See McDonough,* 687 F.2d at 343 ("Good faith, however, is irrelevant to our inquiry."), *reversed,* 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984).

38. Commonly known as "*Remmer* hearings," a reference to *Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954).

If the post-trial hearing demonstrates that the Juror was actually biased, then the verdict may be set aside. *See United States v. Malloy*, 758 F.2d 979, 982 (4th Cir.1985). Having conducted such a hearing on April 29, the Court now concludes that an actual bias in favor of the Prosecutor infected the Juror, manifesting itself in his conduct, and that this circumstance would satisfy the fifth and final aspect of the Rule 33 inquiry.

■ Whether a juror was actually biased is a factual question. *See Gonzales*, 99 F.3d at 986 (citing *Patton v. Yount*, 467 U.S. 1025, 1036, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984)).[39] At the hearing on April 29, the Juror maintained that he was honest during the voir dire, and he stated that "my decision [to vote for conviction] was not based on my relationship with [the Prosecutor]." (Apr. 29 Tr. at 9.) It is true that, in *Remmer* hearings, the Supreme Court has long admonished that "surely one who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain matter." *Smith v. Phillips*, 455 U.S. 209, 217 n. 7, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) (quoting *Dennis v. United States*, 339 U.S. 162, 171, 70 S.Ct. 519, 94 L.Ed. 734 (1950)). However, even though the Juror's subjective perception of the absence of bias made both during the voir dire and at the *Remmer* hearing was doubtlessly thought by the Juror to be true at the time of his statements, his professions of impartiality must be assessed objectively in light of the conduct in which he engaged.

■ Viewed objectively, the conduct in which the Juror engaged cannot be described as that of someone whose relationship with the Prosecutor would not affect his partiality. The "new evidence" in the record establishes that the Juror, who knew the Prosecutor both professionally and socially, simply could not resist communicating with, and making friendly gestures toward, the Prosecutor on several occasions. Very shortly after having vouchsafed that his relationship would not interfere with his impartiality, the Juror pointed to the Prosecutor's jewelry to express his recognition of it, to signal his approval of her having worn it, and to compliment her appearance. Either then or later he also gave her a "thumbs-up" sign, and he could not "rule out" the possibility that he waved at, or spoke with, the Prosecutor while passing in the hall during recesses in the proceedings. This was all occurring, of course, during a trial in which the credibility of the prosecution's witnesses was crucial to the case and by no means convincing, and during demonstrably close jury deliberations.

The Juror's conduct, particularly under the circumstances of this trial, evinces an actual bias in favor of the Prosecutor which was animated by a business relationship which the Juror had sworn he could put aside. The Juror's professions to the contrary do not alter that conclusion. Put simply, the record here establishes beyond peradventure that the Juror had no business sitting in judgment of Lawhorne. At critical times during the trial, the Juror had his relationship with the Prosecutor on his mind, an affinity so strong that he could not keep it to himself, notwithstanding a promise, solemnly made, that the relationship would not stand in the way of impartial service on the jury. It was with this mindset that the Juror voted for conviction.

The totality of the circumstances in the record thus convinces the Court that the Juror was actually, *albeit* perhaps innocently, biased in favor of the prosecution.[40] Hence,

---

**39.** "The bias of a prospective juror may be actual or implied; that is, it may be bias in fact or bias conclusively presumed as a matter of law." *Fitzgerald*, 150 F.3d at 365 (quoting *United States v. Wood*, 299 U.S. 123, 133, 57 S.Ct. 177, 81 L.Ed. 78 (1936)). Assuming, as the *Fitzgerald* court did, that implied bias remains a viable doctrine, it is not applicable in this case. Implied bias "is limited in application to those extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances." *Person v. Miller*, 854 F.2d 656, 664 (4th Cir.1988). The Juror's relationship with the Prosecutor here, in the abstract, is not an exceptional one; thus, the issue is whether the Juror's demonstrated affinity with the Prosecutor constitutes actual bias.

**40.** The Fourth Circuit recently explained that instances of juror bias, even if established, are examined for harmlessness. *See Fitzgerald*, 150 F.3d at 365. Because the Court has found that the error resulting from the Juror's presence on the jury affected Lawhorne's "substantial rights"

if the general Sixth Amendment attack on the partiality of a juror is used as the framework for assessing the fifth aspect of the Rule 33 test for a new trial, the Court concludes that Lawhorne's "new evidence" likely would have produced a mistrial or a new trial if it had been made known to the Court.

However, under *United States v. Smith*, 62 F.3d 641 (4th Cir.1995), Rule 33's two-year window appears to be strictly limited to motions premised on "evidence *that would be admissible* were a new trial to be granted." *Id.* at 649 (emphasis added). That rule forecloses relief to Lawhorne under Rule 33.

## III. Plain Error

 Nonetheless, the record here reflects a proceeding tainted by a juror with a demonstrated affinity for the prosecutor. And, as explained previously, Lawhorne has not "waived" his right to a new trial stemming from this flaw. Rather, defense counsel's negligent failure to make a timely objection once the relevant information surfaced renders the flaw a "forfeited" error. *See United States v. Olano*, 507 U.S. 725, 731, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) ("[F]orfeiture is the failure to make the timely assertion of a right."); *United States v. David*, 83 F.3d 638, 641 n. 5 (4th Cir.1996); *supra* Part I.B. This distinction is a crucial one, because "[m]ere forfeiture, as opposed to waiver, does not extinguish an 'error' " within the meaning of Fed.R.Crim.P. 52(b). *Olano*, 507 U.S. at 733, 113 S.Ct. 1770. To the contrary, Rule 52(b) vests courts with the discretion to notice a "plain error" not timely raised in the proceeding and, if one exists, to correct the error by granting a new trial. *See* Fed.R.Crim.P. 52(b); *United States v. Osborne*, 532 F.Supp. 857 (W.D.Va.1982).[41]

Although Rule 52(b) is commonly considered as delineating a standard of appellate review, it is available for use both by district and appellate courts. *See* Fed.R.CrimP. 54(a); 3A Wright, *supra*, § 851, at 294.[42] Although Rule 52(b) is commonly invoked by counsel who, on appeal, discover an error to which they previously failed to object, the rule "is not so limited," and a court may take notice of a plain error in the proceedings on its own motion. 3A Wright, *supra*, § 856, at 338; *see United States v. Jackson*, 32 F.3d 1101, 1112 (7th Cir.1994) (Posner, C.J., concurring).

 The Supreme Court enunciated in *United States v. Olano*, and later refined in *Johnson v. United States*, 520 U.S. 461, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997), the controlling test for plain error review. Thus, a court may correct an error not raised at trial upon finding (1) an "error," (2) that is "plain," and (3) that "affect[s] substantial rights." *Johnson*, 117 S.Ct. at 1548; *Olano*, 507 U.S. at 732–34, 113 S.Ct. 1770. If all three conditions are met, a court then may exercise its discretion to notice a forfeited error, "but only if (4) the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.' " *Johnson*, 117 S.Ct. at 1549 (quoting *Olano*, 507 U.S. at 732, 113 S.Ct. 1770, in turn quoting *United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555 (1936)). When that test is applied to the facts of this case, the verdict of guilty must be set aside and Lawhorne is entitled to a new trial.

### A. "Error"

 In reviewing for plain error, the initial inquiry is whether an error occurred. An "error" is, simply, a "[d]eviation from a legal rule ... unless the rule has been

---

for purposes of plain error analysis, *see infra* Part III.C, it goes without saying that the error in this case was not harmless.

41. Fed.R.Crim.P. 52 provides in relevant part:
(b) **Plain Error.** Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

42. Numerous decisions recognize that district courts are permitted to engage in plain error review and to determine whether a flaw in crimi-

nal proceedings was so patent as to warrant a new trial despite the absence of a timely objection by defense counsel. *See, e.g., United States v. Veal*, 797 F.Supp. 527, 529 (M.D.La.1992); *Osborne*, 532 F.Supp. at 864–66; *see also United States v. Sardesai*, No. 96–4228, 1997 WL 626540, at *5 n. 8 (4th Cir. Oct.10, 1997) (citing *United States v. McBride*, 862 F.2d 1316, 1320 (8th Cir.1988)).

waived." *Olano*, 507 U.S. at 732–33, 113 S.Ct. 1770. Implicit in this definition, and significant in this case, is that "error" for purposes of Rule 52(b) is not limited to mistakes committed exclusively by the trial court; rather, Rule 52(b) is broader in scope, and it can apply whenever "a legal rule was violated during the district court proceedings." *Id.* at 733, 113 S.Ct. 1770.

A legal rule clearly was violated during Lawhorne's trial: he was deprived of the Sixth Amendment right to trial by an impartial jury. That right encompasses two broad areas of juror misconduct claims, and the Juror's presence on Lawhorne's jury gives rise to both. The first, improper juror contact, has long been recognized as the sort of egregious error that a criminal justice system cannot tolerate. *See Mattox v. United States*, 146 U.S. 140, 150, 13 S.Ct. 50, 36 L.Ed. 917 (1892) ("Private communications, possibly prejudicial, between jurors and third persons … are absolutely forbidden, and invalidate the verdict, at least until their harmlessness is made to appear."). The Fourth Circuit has established a three-step process for analyzing allegations of extrajudicial juror contact, *see United States v. Cheek*, 94 F.3d 136, 140 (4th Cir.1996), and, as discussed more fully above in Part II.B.5.a, the repeated communications, by word and gesture, between the Prosecutor and the Juror constituted an "error" of this sort. Specifically, the record establishes that there were in fact extrajudicial communications or contacts; that these were "more than innocuous interventions"; and that there is a reasonable possibility that the repeated improper communications between the Juror and the Prosecutor influenced the jury's verdict of guilty.

The second type of juror misconduct claim (and error in this case) that emanates from the Sixth Amendment guarantee of trial by an impartial jury is a claim involving juror bias. Simply put, when an allegation of juror bias is made, and a post-trial hearing confirms that a juror harbored an actual bias in favor of the prosecution, then an error has been committed and the verdict may be set aside. *See Smith v. Phillips*, 455 U.S. 209, 215, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982);

*Fitzgerald v. Greene*, 150 F.3d 357, 364–65 (4th Cir.1998); *United States v. Malloy*, 758 F.2d 979, 982 (4th Cir.1985). Just as the record in this case suffices to establish a claim sounding in improper juror communication, so too does the record, as fortified by the hearings on April 6 and April 29, establish that the Juror harbored an actual bias in favor of the prosecution. And, as discussed in Part II.B.5.c, the facts demonstrating this bias would have produced a mistrial or a new trial had a timely objection been made.

In sum, whether categorized as improper juror contact or juror bias, Lawhorne's trial was infected by deviation from a legal rule, namely the Sixth Amendment right to trial by an impartial jury. Communications with, and bias in favor of, the prosecutor in a criminal case are evidence tending to show that the Juror likely reached a verdict on grounds other than the trial evidence. This is an error of the most fundamental sort and there can be no serious doubt that it falls within the reach of the term "error" under Rule 52(b).

### B. "Plain"

The second limitation on review under Rule 52(b) is that the "error" be plain. " 'Plain' is synonymous with 'clear' or, equivalently, 'obvious,' " and the Supreme Court has explained that, at a minimum, the error must be "clear under current law." *Olano*, 507 U.S. at 734, 113 S.Ct. 1770. In this case, it is abundantly "clear under current law" that the inclusion of a juror who has been party to an improper contact, or who is actually biased in favor of the prosecution, is erroneous because it renders the criminal conviction subject to attack on Sixth Amendment grounds. *See Fitzgerald*, 150 F.3d at 364–65; *Cheek*, 94 F.3d at 141; *cf. United States v. Jarvis*, 7 F.3d 404, 412 (4th Cir. 1993) (error resulting from a prosecution violative of Double Jeopardy Clause was "plain"). Hence, the error here was plain.

### · C. "Affecting Substantial Rights"

An "error" that is "plain" is only a "plain error" for purposes of Rule 52(b) if the defendant carries his burden of demonstrating that it "affect[s] substantial rights."

Fed.R.Crim.P. 52(b); *see Johnson*, 117 S.Ct. at 1549; *Olano*, 507 U.S. at 734, 113 S.Ct. 1770. The Supreme Court, in *Olano*, explained that "[n]ormally, although not perhaps in every case, the defendant must make a specific showing of prejudice to satisfy the 'affecting substantial rights' prong of Rule 52(b)." *Id.* at 735, 113 S.Ct. 1770. This generally requires the defendant to prove that the error actually affected the outcome of the proceedings. *See United States v. Hastings*, 134 F.3d 235, 240 (4th Cir.), *cert. denied*, ― U.S. ―, 118 S.Ct. 1852, 140 L.Ed.2d 1100 (1998). The Supreme Court, recognized, however, that proof of this sort need not always be specific; there may be some errors "that should be presumed prejudicial if the defendant cannot make a specific showing of prejudice." 507 U.S. at 735, 113 S.Ct. 1770.

The record in this case clearly establishes that the inclusion of the Juror on the jury during the trial was specific prejudice that affected Lawhorne's "substantial rights." As explained previously, the Juror was actually biased in favor of the prosecution. That is shown by his previous relationship with the Prosecutor, his repeated communications and gestures towards her throughout the proceedings, and his positive signaling to her during otherwise strenuous deliberations. *See supra* Part II.B.5.c. Those facts, when coupled with the undisputed fact that the Juror voted in favor of conviction, command an inference that actual prejudice affected Lawhorne's substantial rights.

That conclusion is bolstered by the particulars of this case, in which the evidence of possession was conflicting, the credibility of government witnesses was directly in issue by virtue of material inconsistencies in their testimony, and the jury was so demonstrably divided that an *Allen* charge was given. Unlike other cases in which "overwhelming evidence of guilt" prohibited a finding of the requisite degree of prejudice necessary under Rule 52(b), *see United States v. Moore*, 11 F.3d 475, 482 (4th Cir.1993), the record in

this case simply does not pose a similar bar. Rather, it is difficult to imagine an error more capable of drastically affecting the outcome of a judicial proceeding.[43]

In addition, the Fourth Circuit has found prejudice sufficient to affect "substantial rights" in other situations implicating the right to an impartial jury that, though similarly egregious, did not call into question the propriety of the jury's verdict. *See United States v. Hanno*, 21 F.3d 42, 48 (4th Cir. 1994) (finding prejudice sufficient to satisfy the third prong of *Olano* where, before trial, the district court removed and replaced jurors without notice to, and in absence of, the defendant and defendant's attorney). And, where the purported error amounted to a direct violation of other constitutional rights, such as the bringing of consecutive prosecutions against a defendant for the same offense in violation of the Double Jeopardy Clause, *see United States v. Jarvis*, 7 F.3d 404, 413 (4th Cir.1993), the Fourth Circuit has held that the miscue "affect[ed]" the defendant's "substantial rights." *See id.* When the record in this case is considered independently, and in conjunction with these principles, the magnitude of the error wrought by the Juror's presence on Lawhorne's jury establishes prejudice that affected Lawhorne's substantial rights.

Even if the record here did not show actual prejudice to substantial rights, there is prejudice to such rights here because the Supreme Court, in *Olano*, recognized that there may be "errors that should be presumed prejudicial if the defendant cannot make a specific showing of prejudice." 507 U.S. at 739, 113 S.Ct. 1770. In that respect, it must be remembered that a presumption of prejudice arises from improper juror contacts. And, as previously explained, a heavy burden is cast upon the government to rebut the presumption. *See Remmer v. United States*, 347 U.S. 227, 229–30, 74 S.Ct. 450, 98 L.Ed. 654 (1954); *United States v. Cheek*, 94 F.3d 136, 140 (4th Cir.1996).[44] As discussed

---

**43.** For example, if the verbal communications and gestures during deliberations had been made known to the Court, a mistrial likely would have been declared, but if not, there certainly would have been no *Allen* charge.

**44.** Though frequently litigated in connection with Rule 33 motions, there is no reason to limit the *Remmer* presumption to that context and to not apply it in Rule 52(b) analyses. *See Pekar v. United States*, 315 F.2d 319, 321 (5th Cir.1963).

more fully in Part II.B.5.a above, the error arising out of the Juror's repeated communications, gestures, and signals to the Prosecutor in this case must be characterized as far "more than innocuous," and thus the improper contact triggers the *Remmer* presumption, and the United States has not rebutted that presumption of prejudice. The record thus establishes that the error in this case prejudiced Lawhorne, both specifically and presumptively, by affecting the outcome of his trial.

Even were this not the case, however, the Supreme Court, in *Olano*, observed that there may "be a special category of forfeited errors that can be corrected regardless of their effect on the outcome" of the proceedings. *Olano*, 507 U.S. at 735, 113 S.Ct. 1770. In other words, some errors may "affect[ ] substantial rights" even absent demonstrated prejudice, or a demonstrated effect on the outcome of the trial.[45]

The error in this case may very well fall within this "special category." The Juror' presence on Lawhorne's jury gave rise to an error markedly different than that in *Olano:* the error there was rooted in non-compliance with the Rules of Criminal Procedure, whereas in this case the flaw is of constitutional proportions.[46] And, the Fourth Circuit has held that this "special category" is not merely illusory; an error that "cannot be reviewed for harmlessness, including a 'failure to instruct on an element of the crime, where the jury never made the constitutionally required findings,' automatically satisfies the third prong of the plain-error analysis without a specific showing of prejudice by the

defendant." *Hastings*, 134 F.3d at 240 (quoting *United States v. David*, 83 F.3d 638, 647 (4th Cir.1996)). The decisional law in this Circuit thus reflects a tendency toward vindicating the rights guaranteed to a defendant by the Sixth Amendment without regard to prejudice in the Rule 52(b) context. *See id.; but see Fitzgerald*, 150 F.3d at 365 (stating that, in state habeas corpus case, "this Court has repeatedly examined instances of juror misconduct and bias for harmlessness"). These considerations, along with the undeniable reality that prejudice in such matters is generally difficult to prove, *see* Fed.R.Evid. 606(b), and, in any event, already presumed under Supreme Court doctrine, *see supra*, suggest that this case also falls within that "special category" of circumstances in which prejudice is not apposite. But, because the record in this case in fact establishes prejudice (and, thus, the third prong of the *Olano* test), the Court need not reach that issue.

### D. Exercise of Discretion to Correct Error

Rule 52(b) vests courts with the authority to order correction, but the rule is permissive, not mandatory, in nature. *See Olano*, 507 U.S. at 736, 113 S.Ct. 1770; *David*, 83 F.3d at 648. Having found that the inclusion of the Juror on Lawhorne's jury amounted to a "plain error" within the meaning of Rule 52(b), remedial authority under that Rule has been established, and it is necessary now to determine whether the forfeited error " 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings' " before

---

**45.** The Supreme Court in *Olano* held that the alleged error in that case—the presence of alternate jurors during jury deliberations in violation of Fed.R.Crim.P. 24(c)—was not of the type that "affect[ed] substantial rights" independent of prejudice.

**46.** In many respects, the error resulting from the Juror's presence on Lawhorne's jury approximates a "structural error," which is a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Johnson*, 117 S.Ct. at 1549 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)). The Supreme Court has identified several categories of constitutional errors that defy harmless error review and are thus "structural." These

include the total deprivation of the right to counsel at trial, *see Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), and the unlawful exclusion of members of the defendant's race from a grand jury, *see Vasquez v. Hillery*, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986). *See Fulminante*, 499 U.S. at 310, 111 S.Ct. 1246. Perhaps the decision most analogous to the error in Lawhorne's case is *Tumey v.. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927), where the Supreme Court held that the lack of an impartial trial judge constituted a "structural" defect. The decision in *Olano*, by permitting a new trial where the special category of adversely affected substantial rights is shown, avoids the need to make a "structural error" analysis in most cases.

exercising the discretion to correct the error. *Johnson*, 117 S.Ct. at 1549 (quoting *Olano*, 507 U.S. at 736, 113 S.Ct. 1770, in turn quoting *Atkinson*, 297 U.S. at 160, 56 S.Ct. 391).[47] The Supreme Court has explained that this discretion should be employed only in circumstances in which a miscarriage of justice would otherwise result; however, the Court also has emphasized that the powerful remedy of Rule 52(b) is not limited to cases of actual innocence. *See Olano*, 507 U.S. at 736, 113 S.Ct. 1770.

Central to this final inquiry is "a determination whether, based on the record in its entirety, the proceedings against the accused resulted in a fair and reliable determination of guilt." *Hastings*, 134 F.3d at 244 (quoting *United States v. Cedelle*, 89 F.3d 181, 186 (4th Cir.1996)). The proceedings in this case most certainly did not.

Viewing the error against the record as a whole establishes that the proceedings against Lawhorne were neither fair nor reliable. The evidence was such that Lawhorne's conviction was by no means "inevitable." *Compare Cedelle*, 89 F.3d at 186. To the contrary, testimony concerning the key issue in the case—whether Lawhorne in fact "possessed" a firearm—was conflicting. The jurors thus were charged with making significant and material credibility assessments. The record demonstrates that the Juror could not do so impartially. The Court also has found that the Juror harbored an actual bias in favor of the prosecution, and that he voted for conviction. And, furthermore, there is simply no telling the extent to which this bias caused the Juror to influence the other jurors during the deliberations.

The Fourth Circuit has observed in a related context that "[t]he vindication of constitutional rights is among the most exalted callings of Article III courts." *United States v. Jarvis*, 7 F.3d 404, 413 (4th Cir.1993). It is beyond serious question that the right violated by the Juror's presence on the jury, and by his vote in favor of conviction, was a right of constitutional dimension. Because the matter was not brought to the Court's attention sooner, neither the Court nor the public can have any confidence in the fairness or integrity of Lawhorne's conviction. For these reasons, to allow the jury's verdict to stand would, without a doubt, severely impact the "fairness, integrity [and] public reputation of judicial proceedings." *Olano*, 507 U.S. at 736, 113 S.Ct. 1770.

In sum, exercise of the discretion vested in the Court under Rule 52(b) to notice and correct "plain error" is appropriate in this instance. Independent of whether Lawhorne may avail himself of Rule 33, and pursuant to Rule 52(b), the Court now holds that the Juror's presence on Lawhorne's jury constituted a plain error requiring that the conviction be vacated and that a new trial be granted.

## CONCLUSION

The defendant in a criminal case should never be subjected to the risk that the balance will be tipped against him by a relationship of affinity between a juror and the prosecutor of such a nature that the juror sends signals to the prosecutor. That is especially true where, as here, the issue of guilt or innocence is close and the jury obviously had difficulty reaching a verdict. Liberty is too dear and the guarantees of the Sixth Amendment, the linchpin of our criminal justice system, are too important to allow such a relationship to inject itself, even unwittingly, into the determination of guilt or innocence. For those reasons and the rationale of this opinion, and pursuant to Fed.R.Crim.P. 52(b), the verdict and Judgment In A Criminal Case herein are vacated and a new trial shall be held, if the United States determines to further pursue this matter.

---

**47.** Because a Rule 52(b) inquiry is only necessary in this case if Rule 33 is wholly inapplicable, *see supra* Part II.A, the Court need not consider the thorny issue of whether a court may order a new trial on plain error grounds in a case that, because it involves newly discovered evidence tending to establish.innocence, falls within the reach of Rule 33 yet does not pass the five-part test that is the predicate to Rule 33 relief in this Circuit. It bears mention, however, that relief under Rule 52(b) is appropriate even when relief is specifically precluded under a particular and otherwise applicable provision of the Federal Rules of Criminal Procedure. *See, e.g., Johnson*, 117 S.Ct. at 1547 (observing that Rule 52(b) mitigates Rule 30).

The Clerk is directed to send a copy of this Memorandum Opinion to counsel of record.

It is so ORDERED.