### The STATE of Ohio, Appellant,

v.

### JENKINS, Appellee.

[Cite as *State v. Jenkins*, 192 Ohio App.3d 276, 2011-Ohio-754.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 24220.

Decided Feb. 18, 2011.

278

Mathias Heck Jr., Montgomery County Prosecuting Attorney, and Timothy J. Cole, Assistant Prosecuting Attorney, for appellant.

D.K. Wehner, Montgomery County Public Defender, and Susan F. Souther, Assistant Public Defender, for appellee.

Donovan, Judge.

{¶ 1} This matter is before the court on the notice of appeal of the state of Ohio, filed August 24, 2010. On March 19, 2010, Nicholas Steven Jenkins was indicted on seven counts of burglary, in violation of R.C. 2911.12(A)(3), felonies of the third degree. Jenkins pleaded not guilty, and on April 8, 2010, he filed a motion to suppress. On August 18, 2010, the trial court sustained Jenkins's motion to suppress.

{¶ 2} The sequence of events giving rise to this matter began on February 10, 2010, when Officer Bradley Liston of the Oakwood Police Department, while on routine patrol, observed Jenkins walking on Oakwood Avenue in Oakwood. Liston noted that Jenkins matched the description of a suspect in local burglaries. When Jenkins entered the Sunoco gas station at Irving Avenue, Liston waited for him to exit and then approached Jenkins, advising him that he matched the description of a burglary suspect. Jenkins was carrying a shoulder bag, and after ascertaining Jenkins's identity, Liston asked Jenkins about the contents of the bag. Jenkins told Liston that he was homeless, that he carried all his possessions in the bag, and that he was in a hurry to reach the bus station because he had to go to North Carolina to get his son. At that time, Liston learned via radio that there was an outstanding warrant for Jenkins's arrest.

{¶ 3} Liston conducted a pat down of Jenkins in the presence of Officer Gail Schmidt and another officer who had responded to the scene. Jenkins attempted to flee in the course of the pat down. When Liston restrained him, Jenkins continued to resist arrest. One of the other officers tazed Jenkins so that he could be handcuffed. After Jenkins was placed in handcuffs, he again attempted to flee. After running about 100 yards, Jenkins stopped after Liston told him that he would be tazed again if he continued to run. Jenkins sustained an abrasion above his left eye in the course of his arrest. Liston transported Jenkins to jail, and Jenkins declined Liston's offer of medical treatment. Liston provided Jenkins with a cigarette, and he also gave him a soda to drink and some cookies. During his entire encounter with Jenkins, Liston described him as normal and alert and not impaired.

{¶ 4} Lieutenant Jeffrey Yount testified at the suppression hearing that he first came into contact with Jenkins in the course of his arrest and that he subsequently interviewed him at the police station. As Jenkins sat in an interview room, Yount observed that Jenkins wore clothing similar to that worn by a suspect who had burglarized a home at 219 Beverly Place. Yount told Jenkins, "I think I have a bulletin hanging in my road room that has your picture on it." Yount "went to get the bulletin and came back and held the bulletin in

[his] hand and * * * said, are you Nic[h]olas Jenkins?  Person on this form is Nicholas Jenkins and he acknowledged yes."

{¶ 5} Yount advised Jenkins that he was going to be interviewed regarding the crimes of theft and burglary, and he went through each of Jenkins's *Miranda* rights as enumerated on a preinterview form, ascertaining Jenkins's understanding for each right, as well as for the waiver of rights.  Jenkins indicated to Yount that he had completed the eighth grade.  Jenkins signed the interview form, and Yount testified that he seemed coherent at the time and was able to understand what was happening.  Jenkins made verbal statements to Yount, and the interview was concluded when Yount "asked him if he would ride around with [police] and show [police] the locations in which he admitted to committing a burglary and he agreed to do so."  Yount added, "And after we drove around, my officer dropped me back off at the station and [Jenkins] was transported to the Montgomery County Jail."  Yount testified that it took the officers about an hour to get Jenkins booked into the Oakwood jail, and that his subsequent initial interview lasted 45 minutes to an hour.

{¶ 6} On cross-examination, Yount testified that he remembered Jenkins saying, when he was initially in custody, "Kill me.  Kill me.  Kill me.  Shoot me in the head.  Just shoot me in the head."  Yount said, "[I] remember him saying things like, 'I've taken every drug that I can possibly get my hands on to kill myself and I won't die.'  Those are the kinds of things I remember him saying.  If he said he was on drugs for five days, I would believe that."  According to Yount, once Jenkins "was in cuffs and in the jail, he didn't exhibit anything.  He appeared to be very normal, appeared to be very cooperative, articulate.  He went on to tell [police] he's a certified electrician which shows that he's somewhat educated, that he understands how to get a job as a certified electrician and things appeared to be normal * * *."

{¶ 7} The following exchange occurred:

{¶ 8} "Q. * * * And did you tell him that you would try to help him?

{¶ 9} "A. That we would do everything we could.

{¶ 10} "Q. Did you tell him that you could get him treatment?

{¶ 11} "A. No. We talked about treatment in lieu of—we have to talk to the prosecutor.  We can't make deals before we actually talk to the prosecutor.

{¶ 12} "* * *

{¶ 13} "Q. Did you tell him that I have the power to cut deals?

{¶ 14} "A. No. * * * I believe the statement would have been the department has some influence on things that happen throughout the trial of the case.

{¶ 15} "Q. Did you indicate either through words or actions that you were the man in control and you could make it happen that he gets treatment if he just told you where these burglaries were?

{¶ 16} "A. Well, first of all, I was on the case so I don't know if that came across. I didn't need to say it. I would never tell anybody that. And, secondly, just let me go back and restate again. If there was any special treatment, that would have also been under the understanding that would have come through the prosecutor's office. Once the case was presented to the prosecutor's office, that's when these types of things are done."

{¶ 17} On recross-examination, the following exchange occurred:

{¶ 18} "Q. * * * And your statement here today is you never promised him that he would get treatment?

{¶ 19} "A. No. I'm not saying we did not talk about treatment. I'm saying I did not make him an agreement whether or not he would get treatment before we got the authorization through the prosecutor on what we were going to do with the charge. That is what I said on the earlier testimony and that's what I'm saying now."

{¶ 20} According to Yount, on February 11, 2010, Jenkins was returned to the Oakwood Municipal Court for his arraignment on the resisting-arrest charge, and after Yount completed a second preinterview form with him regarding his rights, Jenkins provided oral and written statements. Regarding the arraignment on the misdemeanor charge, Yount testified, "I think I conferred with a judge and the judge said something to the effect, I believe, Mr. Jenkins laid out to him just exactly his condition and my comment back to the judge was, your Honor, we need to turn this guy into a productive citizen in the United States."

{¶ 21} The following exchange then occurred:

{¶ 22} "Q. * * * And did you say that you wanted him to do treatment? Did you indicate that to the judge, that treatment was what was the best thing for Mr. Jenkins?

{¶ 23} "A. Yeah, I believe the treatment was mentioned. Absolutely.

{¶ 24} "Q. You mean you mentioned it?

{¶ 25} "A. Yeah, I believe I did. Absolutely.

{¶ 26} " * * *

{¶ 27} "A. I don't recall exactly but, yeah, I believe we had the conversation.

{¶ 28} "Q. * * * So you were promoting treatment for Mr. Jenkins to the judge?

{¶ 29} "A. I don't know if you call it promoting but, yeah, I said Mr. Jenkins—

{¶ 30} "Q. That's a yes?

{¶ 31} "A. Sure.

{¶ 32} "THE COURT: I'm sorry, you were interrupted. You said what?

{¶ 33} "THE WITNESS: That I believe Mr. Jenkins could use some treatment, absolutely."

{¶ 34} On the afternoon of February 11, Yount went to the home of Jenkins's mother and obtained her consent to search her home for items stolen during the burglaries. On February 12, Jenkins was returned to the Oakwood Municipal Court for arraignment on the burglary charges. Yount told Jenkins that he had visited his mother and that she "could be charged with three counts of receiving stolen property." According to Yount, Jenkins became angry and asked for an attorney.

{¶ 35} Officer Brian Pond testified that he was present when Jenkins arrived at the Oakwood jail for booking and that he "sat with him, had idle conversation." Jenkins "appeared to be alert and oriented." Pond stated that Jenkins "indicated to [Pond] that he had over a hundred-dollar-a-day drug addiction" and that Jenkins did not appear to be experiencing any type of withdrawal. Pond observed an abrasion above Jenkins's eye and "offered a four by four, that I put some water on, just a moist dressing just to dab it a little bit." Pond also "offered a blanket to him to make him a little bit more comfortable."

{¶ 36} Officer Scott Cavin testified that he transported Jenkins to the Oakwood Safety Department on February 11 from the Montgomery County Jail and was present when Jenkins spoke to Yount. According to Cavin, "Mr. Jenkins was a very sharp individual. He seemed to converse with me, he was very nice and polite. Seemed to be more on the ball than most criminals I deal with. * * * I didn't see any immediate medical or psychological problems." Cavin further testified, "[Jenkins] did not ask for medical treatment from me but I do recall him talking about how he wanted to—he had an appointment with paramedics at the county jail and he was trying to get up to see somebody because he knew that he was going to be coming off heroin and he needed to get some treatment. I mean, the process of coming off that drug, the withdrawal portion he was going to go through. He wanted to try to get something for that." He added, "[Jenkins] seemed pretty normal to me, that he realized that he was getting ready to come off and he was going to have some problems is what he was pretty fearful about." Cavin later returned Jenkins to the Montgomery County Jail, and he testified that Jenkins "was hungry so [Cavin] took him to Burger King, got him a couple cheeseburgers, got him a pack of cigarettes and a coke, made him comfortable."

{¶ 37} Jenkins also testified. According to Jenkins, at the time of his arrest, he was using "[t]ons of cocaine and lots of heroin," having been on "a five-day

binge." Jenkins described his initial interview with Yount as follows: "He told me that he had the authority to get me treatment as long as I helped him. He was a man of his word. He said if I was a man of my word, he would be a man of his word. He would get me treatment as long as I was truthful and honest with him. That was the only way it was going to happen." Jenkins stated that Yount told him that he had the authority, independent of the prosecutor, to arrange treatment in lieu of conviction. At the initial arraignment, Jenkins said, "[T]he judge asked if anybody had anything to say. [Yount] said, yes, your Honor. I do. And he stood up, told him that he didn't think I was a bad guy, that I could be a productive citizen in the United States and that I didn't need to go to prison, that he thought I could use treatment better than prison." After the hearing, on February 11, Jenkins testified that Yount told him that officers had found stolen items at the home of Jenkins's mother and that he "could charge her with three different felonies." He added, "[T]hat's why I told him I'd do whatever it took to keep my mom out of jail." Jenkins stated that he then wrote a statement that read, "I Nic[h]olas Jenkins, am responsible for at least six burglaries in the city of Oakwood all in the area of Patterson and Shroyer and Far Hills."

{¶ 38} In sustaining the state's motion to suppress, the trial court specifically found that it doubted the credibility of Jenkins's entire testimony, and we defer to the trial court's credibility assessment. It further found that Yount's reference, in the course of his initial interview with Jenkins, to " 'treatment in lieu of,' is 'Treatment in Lieu of Conviction,'—now known as 'Intervention in Lieu of Conviction' under R.C. 2951.0[41]." It was particularly significant to the court that Jenkins had an "extremely severe drug problem." The court noted that a residential burglary is at least a third-degree felony, and that Jenkins was accordingly not eligible as a matter of law for intervention in lieu of conviction. "Thus Lt. Yount's discussion with Jenkins, a suspect in multiple residential burglaries, of the possibility that he might receive Treatment in Lieu of Conviction was based upon a misstatement of law.

{¶ 39} "Although Lt. Yount did not promise Treatment in Lieu of Conviction, he falsely led Jenkins, a severe drug addict, to reasonably believe Treatment in Lieu of Conviction was a possibility. This suggested benefit was not merely that which flows naturally from a truthful and honest course of conduct. Rather, Jenkins was given to understand that he might benefit from this lenient treatment from the prosecutor and the courts in exchange for his statements. Upon consideration of the totality of the circumstances, this Court finds that Jenkins' February 10 statements were made in reliance upon this false representation."

{¶ 40} Regarding Jenkins's statements on February 11, the court determined, "Clearly, the issue of Jenkins' need and desire for drug treatment continued on February 11. Jenkins told Officer Cavin 'he was going to be coming off heroin

and he needed to get some treatment.' After Jenkins provided to Lt. Yount both an oral statement and a written statement, Yount made a point of telling Judge Deddens, in Jenkins' presence, 'I believe Mr. Jenkins could use some treatment' and that 'we need to turn this guy into a productive citizen in the United States.' "

{¶ 41} The court concluded, upon "consideration of the totality of the circumstances, this Court finds that Jenkins' February 11 statements were made in his continued reliance upon Lt. Yount's false representation that Treatment in Lieu of Conviction was a possibility." The court found our prior decision, in *State v. Jackson,* Greene App. No. 02CA0001, 2002-Ohio-4680, 2002 WL 31002619, to be "particularly instructive."

{¶ 42} The state asserts one assignment of error as follows:

{¶ 43} "The trial court erred by granting Jenkins' motion to suppress."

{¶ 44} "Appellate courts give great deference to the factual findings of the trier of facts. * * * At a suppression hearing, the trial court serves as the trier of fact, and must judge the credibility of witnesses and the weight of the evidence. * * * The trial court is in the best position to resolve questions of fact and evaluate witness credibility. * * * In reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's factual findings, relies on the trial court's ability to assess the credibility of witnesses, and independently determines whether the trial court applied the proper legal standard to the facts as found. * * * An appellate court is bound to accept the trial court's factual findings as long as they are supported by competent, credible evidence." *State v. Purser,* Greene App. No. 2006 CA 14, 2007-Ohio-192, 2007 WL 127694, ¶ 11.

{¶ 45} "The Fifth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution guarantee that no person in any criminal case shall be compelled to be a witness against himself. The concern that animated the framers to adopt the Fifth Amendment was that coerced confessions are inherently untrustworthy. *Dickerson v. United States* (2000), 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405. 'A free and voluntary confession is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt * * * but a confession forced from the mind by the flattery of hope, or by the torture of fear, comes in so questionable a shape * * * that no credit ought to be given it.' Id. at 433.

{¶ 46} "A suspect may waive his constitutional right against self-incrimination, provided that waiver is voluntary. A suspect's decision to waive his privilege against self-incrimination is made voluntarily absent evidence that his will was overborne and his capacity for self-determination was critically

impaired because of coercive police conduct." *Colorado v. Connelly* (1986), 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473; *State v. Otte* (1996), 74 Ohio St.3d 555, 660 N.E.2d 711.

{¶ 47} "The issues of whether a confession is voluntary, and whether a suspect has been subjected to custodial interrogation so as to require *Miranda* warnings, are analytically separate issues. * * * The due process clause continues to require an inquiry, separate from custody considerations, concerning whether a defendant's will was overborne by the circumstances surrounding the giving of his confession. *Dickerson*, 530 U.S. at 434 [120 S.Ct. 2326, 147 L.Ed.2d 405]. This due process test takes into consideration the totality of all the surrounding facts and circumstances, including the characteristics of the accused and the details of the interrogation. Id. Factors to be considered include the age, mentality, and prior criminal experience of the accused; the length, intensity and frequency of the interrogation; the existence of physical deprivation or mistreatment; and the existence of threats or inducements. * * * If all of the attendant circumstances indicate that the confession was coerced or compelled, it cannot be used to convict the defendant. That determination depends upon a weighing of the pressure to confess against the power of resistance of the person confessing. Id.

{¶ 48} " * * *

{¶ 49} " 'The line to be drawn between permissible police conduct and conduct deemed to induce or tend to induce an involuntary statement does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth, as represented by the police. * * *

{¶ 50} " 'When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct, we can perceive nothing improper in such police activity. On the other hand, if in addition to the foregoing benefit, or in the place thereof, the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible. The offer or promise of such benefit need not be expressed, but may be implied from equivocal language nor otherwise made clear.' " (Citations omitted.) *State v. Jackson*, 2002-Ohio-4680, 2002 WL 31002619, at ¶ 19–22, 28–29.

{¶ 51} Finally, we determined in *Jackson* " 'that false promises made by police to a criminal suspect that he can obtain lenient treatment in exchange for waiving his Fifth Amendment privilege so undermines the suspect's capacity for self-

determination that his election to waive the right and incriminate himself in criminal conduct is fatally impaired. His resulting waiver and statement are thus involuntary for Fifth Amendment purposes. * * * The simple result is that officers must avoid such promises, which are not proper tools of investigation.' " Id. at ¶ 40. Although the state attempts to distinguish *Jackson,* the state's arguments are unpersuasive.

{¶ 52} The record reflects that Jenkins completed the eighth grade. His date of birth and any prior criminal history, or the lack thereof, were not placed in the record. The record does not suggest that his interviews on the 10th and 11th were of unreasonable length or intensity, and the officers attempted to make Jenkins comfortable. The record does not establish that Jenkins was threatened or mistreated during the interrogation.

{¶ 53} However, Jenkins was charged with felonies of the third degree. R.C. 2911.12(A)(3), (C). R.C. 2951.041(B), the intervention-in-lieu-of-conviction statute, provides, "An offender is eligible for intervention in lieu of conviction if the court finds all of the following: * * * (2) The offense is not a felony of the first, second, or third degree * * *." We agree with the trial court that Jenkins was ineligible for intervention in lieu of conviction.

{¶ 54} On February 10, Jenkins made Yount aware of his drug addiction, and Yount discussed intervention in lieu of conviction with Jenkins, and he further indicated that the police department has "influence on things that happen throughout the trial." On February 11, Yount testified that he recommended treatment for Jenkins to the judge. Jenkins was fearful about going into withdrawal. While Yount did not guarantee treatment in exchange for Jenkins's confession, he implied by his conduct and words that such a benefit was a possibility. In considering the nature of the benefit to be derived from Jenkins's confession, namely treatment for a severe drug addiction, we conclude, as did the trial court, that the benefit did not naturally flow from a truthful course of conduct on the part of Yount. Intervention in lieu of conviction was not available as a matter of law, and Yount's false representations undermined Jenkins's capacity for self-determination and impaired his decision to provide incriminating statements. Having considered the totality of the circumstances, the state's sole assignment of error is overruled.

{¶ 55} The judgment of the trial court is affirmed.

Judgment affirmed.

GRADY, P.J., and FAIN, J., concur.