[Cite as *State v. Patel*, 2011-Ohio-6329.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## GREENE COUNTY

STATE OF OHIO                           :
                                        :       Appellate Case No. 2010-CA-77
     Plaintiff-Appellee              :
                                        :       Trial Court Case No. 10-CR-223
v.                                      :
                                        :
HITESH PATEL                            :       (Criminal Appeal from
                                        :        Common Pleas Court)
     Defendant-Appellant         :
                                        :

. . . . . . . . . . .

## O P I N I O N

Rendered on the 9th day of December, 2011.

. . . . . . . . . . .

STEPHEN K. HALLER, Atty. Reg. #0009172, by ELIZABETH A. ELLIS, Atty. Reg. #0074332, Greene County Prosecutor's Office, 61 Greene Street, Xenia, Ohio 45385
     Attorney for Plaintiff-Appellee

JON PAUL RION, Atty. Reg. #0067020, and NICOLE RUTTER-HIRTH, Atty. Reg. #0081004, Rion, Rion & Rion, L.P.A., Inc., 130 West Second Street, Suite 2150, Post Office Box 1262, Dayton, Ohio 45402
     Attorney for Defendant-Appellant

. . . . . . . . . . . . .

HALL, J.

{¶ 1} Hitesh Patel appeals from his conviction and sentence on charges of rape, abduction, gross sexual imposition, and sexual imposition (five counts).

{¶ 2} Patel advances five assignments of error on appeal. First, he contends the trial

court erred in denying his motion for a mistrial. Second, he challenges the legal sufficiency and manifest weight of the evidence to support any of his convictions. Third, he argues that the trial court erred in failing to suppress statements he made to police. Fourth, he claims the trial court erred in allowing him to be convicted and sentenced for allied offenses of similar import. Fifth, he contends the cumulative effect of the foregoing errors deprived him of his right to a fair trial.

{¶ 3} The charges against Patel stemmed from allegations made by employees of a motel he managed in Fairborn, Ohio. One of the women, C.B., a housekeeper, described a "pizza day" incident in which Patel allegedly cornered her in a bathroom while she was cleaning it.[1] According to C.B., he reached inside the back of her pants and touched "the bottom of [her] butt." She alleged that he then reached inside the front of her pants and put his finger in her vagina. C.B. also claimed that Patel had touched her "butt" outside of her clothing on another occasion, touched her breast outside of her clothes, and pushed his pelvis against her backside. A second woman, D.H., who worked at the front desk, accused Patel of "tapp[ing]" her bottom on one occasion. She also alleged that he had hugged her, kissed her cheek, and kissed her chest on top of her clothes.

{¶ 4} Patel was arrested as a result of the foregoing allegations and was interviewed at the Fairborn police department. At the outset of the interview, Patel signed a written waiver of his *Miranda* rights. During the interview, a detective lied to Patel about having video evidence to support the allegations against him. Patel eventually admitted to having touched C.B. and D.H. inappropriately. Based primarily on testimony from the two women and a

---

[1] C.B. called the day in question "pizza day" because Patel had bought her a pizza for lunch that day.

recording of Patel's interview at the police station, which was played at trial, a jury found him guilty of the charges set forth above. The trial court imposed a six-year prison term for the rape conviction, which was based on Patel placing his finger inside C.B.'s vagina. Patel received shorter concurrent sentences for the other convictions, resulting in a total prison term of six years. This appeal followed.

{¶ 5}  In his first assignment of error, Patel challenges the trial court's denial of his motion for a mistrial and its failure to grant him a new trial. This argument concerns two communications between a juror and a prosecution witness who was the lead detective in the case: a brief courthouse conversation during trial and a wink after the jury's verdicts were read.

{¶ 6}  This court has recognized that a mistrial "need[s] to be declared only when the ends of justice so require, and a fair trial is no longer possible." *State v. Patterson*, 188 Ohio App.3d 292,  2010-Ohio-2012, ¶69. In other words, there must be a showing of prejudice. *State v. Gunnell*, Clark App. No. 09-CA-0013, 2010-Ohio-4415, ¶178. "The decision whether to grant a mistrial lies within the trial court's sound discretion." *Patterson*, ¶69.  "In order to demonstrate that a trial court has abused its discretion in denying a motion for a mistrial, a criminal appellant must show that the trial court's decision was arbitrary, unreasonable, or unconscionable." Id.

{¶ 7}  With the foregoing standards in mind, we turn to the evidence before us.  The record reflects that juror number ten approached detective Lee Cyr on the final day of trial as they were entering the courthouse. The juror inquired about a former Fairborn police officer. The detective, who initially did not recognize the juror, responded that the former officer no

longer worked for the police department. After exchanging a few innocuous comments about the former officer, the detective realized he was talking to a juror and walked away. The encounter came to light later that day, after the jury had begun its deliberations, when members of the prosecutor's office became aware of it.

{¶ 8}   When it learned about the conversation, the trial court had the detective and the juror separately brought into chambers and questioned. (Trial transcript, Vol. II at 296-322). The trial court then denied Patel's motion for a mistrial based on the incident. In support, it reasoned:

{¶ 9}   "Well, the Court will find that Detective Cyr and Juror No. 10 were entering the Courtroom this morning. As they were going through security the Juror engaged the Detective in a conversation. The Detective indicated the nature of the conversation. The Juror independently confirmed the nature of the conversation. I find that the extent of the conversation has been noted for the record.

{¶ 10} "At the conclusion of that conversation they parted, went their separate ways.

{¶ 11} "The Court has previously admonished the Jury not to discuss the case with anyone and the Juror was of the opinion that he was following that rule by not discussing the case with anyone else.

{¶ 12} "It was his statement that he was carrying on a conversation with the Officer on matters totally unrelated to the nature of this case or anything dealing with this case.

{¶ 13} "Now, the next question is, as raised by Counsel, what impact does this have upon that Juror's ability to remain on the Jury?

{¶ 14} "The first concern the Court has is has the Juror shared his conversation or the

fact that he even spoke to the Officer with other members of the Jury? And the record reflects by the statement of the Juror that he did not. And so to that extent the Jury has not been advised of the nature of this conversation.

{¶ 15} "The Juror also went on to indicate that this conversation would not affect his ability to consider this case and, further, that he could remain to be fair and impartial in regard to weighing the evidence and deciding the case, and, most importantly, the testimony of the Detective based upon solely what occurred outside the Courtroom which is the subject of this matter.

{¶ 16} "It is the Court's opinion that the Defendant is not prejudiced by the nature of this conversation by the fact that it has not been involved in any way with the case itself. I do not find anything in that regard that would bear upon this Juror's ability to continue in this case.

{¶ 17} "Now, with that determination, and I guess inherently is that I'm going to accept what [defense counsel] said earlier as a motion to dismiss and I'm going to deny the motion to dismiss. That's for the record." (Id. at 316-318).

{¶ 18} Following that ruling, the jury deliberated further and ultimately found Patel guilty.

{¶ 19} After the verdicts were read and the jury departed the courtroom, defense counsel told the trial court that he had just seen juror number ten wink at the lead detective as the jury was dismissed. As a result, defense counsel again requested a mistrial. (Id. at 331). The trial court held an October 20, 2010 evidentiary hearing on the "wink" issue. During the hearing, the detective testified that he told juror number ten "happy birthday" and that the

juror winked at him in response. (Hearing transcript at 69-70). The detective added that one of the prosecutors, Aldolfo Tornichio, earlier had told him to be sure and wish juror number ten a happy birthday. (Id. at 92).

{¶ 20} Juror number ten also testified at the hearing. He agreed that the detective had wished him a happy birthday. Juror number ten testified that he "nodded" in response but could not recall whether he also winked. (Id. at 104-105). Juror number ten denied that the communication by him was "any type of signal" about being on the prosecutor's "team." (Id. at 106).

{¶ 21} The next witness was prosecutor Tornichio. He denied having told the detective to be sure and wish juror number ten a happy birthday. (Id. at 117). He admitted, however, having mentioned to the detective that it was juror number ten's birthday. (Id. at 126). Another prosecutor, Nichole Burke, also testified during the hearing. Burke testified that the detective had called her after the trial to explain the winking incident. (Id. at 134). Burke stated that the detective told her he had told a female juror to "have a nice day." According to Burke, the detective told her that juror number ten had winked at him in response. (Id.). Burke also explained how the prosecution had become aware of the courthouse conversation between juror number ten and the detective during trial. She testified that, while the jury was deliberating, the detective had mentioned to her that juror number ten was "cop-friendly." According to Burke, the detective proceeded to describe his conversation with juror number ten on the morning of the second day of trial. (Id. at 140).

{¶ 22} After hearing all of the testimony and arguments from counsel, the trial court declined to grant a mistrial and order a new trial. In support of its ruling, the trial court

provided a lengthy analysis complete with factual findings and legal conclusions. (Id. at 151-161). The trial court's factual findings concerned both the courthouse conversation during trial and the wink. In short, the trial court found no misconduct by anyone sufficient to require a mistrial and no prejudice to Patel.

{¶ 23} On appeal, Patel contends he should have been granted a new trial based on the two incidents of communication between the detective and juror number ten. Patel argues that the communication constituted an irregularity in the proceedings and misconduct that prejudiced his right to a fair trial. In support of his assignment of error, Patel contends juror number ten's wink was presumptively prejudicial. He further contends the wink belied the juror's earlier claim in chambers that he could be impartial. Finally, Patel claims the wink established an affinity between the detective and juror number ten that should not exist.

{¶ 24} We review the trial court's denial of a mistrial and refusal to grant a new trial for an abuse of discretion. The trial court credited the testimony of the detective and juror number ten that the courthouse conversation during trial did not concern Patel's case. The trial court also credited the juror's assurance that the conversation had not been shared with other jurors. Finally, the trial court accepted juror number ten's assurance that he could remain fair and impartial despite the brief conversation. Therefore, we agree with the trial court's finding that the conversation in no way prejudiced Patel's right to a fair trial.

{¶ 25} We reach the same conclusion with regard to the wink. The trial court appears to have found as a matter of fact that juror number ten did wink at the detective, apparently in response to the detective wishing him a happy birthday. Once again, this communication between the detective and juror number ten had nothing to do with Patel's case. Notably, the

wink incident took place after the verdict was announced and the jury was leaving. Consequently, the wink incident itself could not have impacted the verdict already reached. The only import of the wink incident is whether it provides new or different evidence that the first incident, about the conversation at the security station, was something more, in substance or result, than originally determined to be. The trial court rejected that argument and we find no abuse of discretion in that conclusion. Even if we assume that the wink occurred after juror number ten saw the detective tell a female juror to have a nice day, it still had nothing to do with Patel's case. By overruling Patel's motion for a mistrial, the trial court plainly rejected his theory, which was denied by juror number ten, that the wink revealed some affinity between juror number ten and the detective and indicated that the juror was biased for the prosecution.

{¶ 26} In finding no prejudice to Patel, we reject his argument that prejudice must be presumed in this case. In support, Patel relies on *United States v. Lawhorne* (E.D.Va. 1998), 29 F.Supp.2d 292. There a federal district court concluded that when communications between a prosecutor and a juror during trial "cannot be characterized as innocuous, there arises a presumption of prejudice." Id. at 308. In such a case, the government bears the burden to establish the absence of prejudice. Id. In Patel's case, however, the record reflects that the two communications at issue *were* innocuous. The first involved a brief conversation that had nothing to do with Patel's trial. The second involved a juror's wink in response to a detective either wishing the juror happy birthday or telling another juror to have a nice day after the jury had been released from service. We are unpersuaded that these communications created a presumption of prejudice. In the absence of demonstrable prejudice to Patel, which

does not exist in light of the trial court's findings, we cannot say the trial court abused its discretion in denying the motion for a mistrial and refusing to grant Patel a new trial. Accordingly, the first assignment of error is overruled.

{¶ 27} In his second assignment of error, Patel challenges the legal sufficiency and manifest weight of the evidence to support his convictions. With regard to the rape conviction, Patel contends the State presented no evidence that he used or threatened to use force when he placed his finger in C.B.'s vagina. Likewise, with regard to the gross sexual imposition conviction, which involved his reaching inside the back of C.B.'s pants, Patel claims the State presented no evidence of force. He also contends the State presented no evidence that he reached inside the back of C.B.'s pants for the purpose of sexual arousal or sexual gratification.

{¶ 28} Patel also challenges the weight and sufficiency of the evidence to support his conviction on five counts of sexual imposition. These convictions involved Patel patting D.H. on the buttocks, kissing D.H.'s chest on top of her clothes, grabbing C.B.'s buttocks outside of her clothes, grabbing C.B.'s breast outside of her clothes, and pushing his pelvis into C.B.'s backside. With regard to D.H., Patel claims the record is devoid of evidence that his conduct was offensive to her or that he believed it would be offensive. He also claims he kissed her "chest," not her "breast." As for the touching of C.B., Patel insists the State presented no evidence that his actions were offensive to her or that he believed they would be offensive. He also argues that pushing his pelvis against C.B.'s "back" was not unlawful because her back is not an erogenous zone.

{¶ 29} Finally, Patel challenges the weight and sufficiency of the evidence to support

his conviction for abduction. He contends the record lacks evidence that he restrained C.B.'s liberty in any way when he placed his hand down her pants in a bathroom. He also claims the State presented no evidence that he restrained C.B.'s liberty on that occasion by force or threat of force. He additionally claims the State presented no evidence that any restraint created a risk of physical harm or placed C.B. in fear. In connection with each of his arguments under this assignment of error, Patel challenges the credibility of C.B. and D.H..

{¶ 30} When a defendant challenges the sufficiency of the evidence, he is arguing that the State presented inadequate evidence on each element of the offense to sustain the verdict as a matter of law. *State v. Hawn* (2000), 138 Ohio App.3d 449, 471. "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.

{¶ 31} Our analysis is somewhat different when reviewing a manifest-weight argument. When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52 (citations omitted). A judgment should be

reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin* (1983), 20 Ohio App.3d 172, 175.

{¶ 32} Having reviewed the record, we conclude that Patel's convictions are based on legally sufficient evidence and are not against the manifest weight of the evidence. With regard to the rape conviction, C.B.'s testimony established the disputed element of force. C.B. testified as follows about the incident, which took place while she was trying to clean a bathroom:

{¶ 33} "Q. All right. So what happened when [defendant] Tish came in?

{¶ 34} "A. After we had the discussion, after he asked me if I was hungry and everything, I thought he had left, but apparently he had shut the door and that's when he had reached in the back of my underwear and liner of my pants and told me that I had pretty, nice silk underwear.

{¶ 35} "Q. What kind of pants were you wearing on pizza day, if you remember?

{¶ 36} "A. They were scrub pants.

{¶ 37} "Q. And when Tish makes a comment about your underwear, what happens next?

{¶ 38} "A. He rammed his hand down my pants, touching the bottom of my butt.

{¶ 39} "Q. So his hand is touching the flesh of your butt at this point?

{¶ 40} "A. Yes.

{¶ 41} "Q. What was your reaction when you felt Tish's hand on the flesh of your buttocks on this day, on pizza day.?

**{¶ 42}** "A. I hurried and stood up and turned around.

**{¶ 43}** "Q. Why did you hurriedly stand up and turn around?

**{¶ 44}** "A. Because I was shocked and I wasn't expecting that.

**{¶ 45}** "Q. Did you say anything to him when you turned around?

**{¶ 46}** "A. No. By then he had done grabbed me and his hand by then was in the front of me and he had his finger in my vagina.

**{¶ 47}** "Q. How did you know his finger is inside your vagina, ma'am?

**{¶ 48}** "A. Because I felt it.

**{¶ 49}** "Q. And when Tish's finger was inside your vagina was he compelling you to submit to his finger inside your vagina by force?

**{¶ 50}** "A. Yes, it was by force.

**{¶ 51}** "Q. Why do you say yes? * * *

**{¶ 52}** "A. Because it was not willingly. I was not willingly participating in that.

**{¶ 53}** "Q. Did you say anything to him when he had his finger inside your vagina?

**{¶ 54}** "A. Yeah. 'Stop.'

**{¶ 55}** "Q. And did he?

**{¶ 56}** "A. No. Then he goes and reaches for a kiss and rams his tongue down my throat.

**{¶ 57}** "Q. At this point are you facing the hotel room bathroom door or not?

**{¶ 58}** "A. Yeah, my face is toward the door.

**{¶ 59}** "Q. Is that door opened or closed?

**{¶ 60}** "A. No, it was locked.

{¶ 61} "Q. Did you try to escape from Tish's clutching at this point?

{¶ 62} "A. I was pushing him, but his back was against the door." (Trial transcript, Vol. I at 51-53).

{¶ 63} The foregoing testimony is sufficient to establish the force element of rape. "Force" includes any compulsion or constraint physically exerted against a person. R.C. 2901.01(A)(1). Here the jury reasonably could have found force based on C.B.'s testimony that Patel held her in a locked bathroom and inserted his finger in her vagina against her will and while ignoring her plea to stop. The same testimony supports a finding that Patel used force to commit gross sexual imposition by "ramm[ing] his hand down [C.B.'s] pants" and touching her buttocks. Under the circumstances, the jury also reasonably could have inferred that Patel acted with the purpose of sexual gratification.

{¶ 64} We reach the same conclusion with regard to Patel's five sexual imposition convictions. D.H. testified that Patel patted her on the buttocks and once kissed her chest on top of her clothes. According to D.H., the first incident occurred when she and Patel were checking the heater in a room. D.H. did not like Patel touching her buttocks and did not ask him to do so. As for the kissing incident, D.H. testified that Patel placed his head on the "top part of [her] breast and the chest area" and kissed her "chest." She again testified that his conduct was unwanted and uninvited. Although Patel suggests that his actions constituted non-offensive playfulness, the jury reasonably could have concluded that he knew otherwise. We are equally unpersuaded by Patel's attempt to distinguish D.H.'s "breast" from her "chest." Seizing on D.H.'s testimony that he kissed her "chest," Patel asserts that a chest is not an erogenous zone. We reject this argument for at least two reasons. First, D.H. testified that

Patel placed his head partially on her "breast." Second, his act of kissing her "chest" was sufficient to establish the contact necessary for a sexual imposition conviction. See *State v. Harrell* (Jan. 3, 2000), Delaware App. No. 99CAA03013 (finding that the "female chest area" is an erogenous zone).

{¶ 65} The other three sexual imposition convictions involved Patel grabbing C.B.'s buttocks outside of her clothes, grabbing C.B.'s breast outside of her clothes, and pushing his pelvis into C.B.'s backside. Specifically, just days after "pizza day," Patel "grabbed" C.B.'s buttocks despite her earlier complaints in the bathroom. Not long after that, he "copped a feel" by grabbing C.B.'s breasts. She responded by telling him to leave her alone—just as she had done on other occasions. According to C.B., the third incident occurred when Patel bent her over a sink, placed his hands on her hips, and "ramm[ed]" his pelvis against her hips. C.B. told Patel to stop, but he explained to her that he was trying to see if they "were a perfect fit." Based on C.B.'s testimony, the jury reasonably could have found that Patel knew his actions were offensive. Moreover, C.B.'s testimony refutes Patel's claim that he merely placed his pelvis against her "back." She testified that he pressed against her with his hands on her hips "like [they] were about to do it doggie style."

{¶ 66} Finally, the evidence supports Patel's abduction conviction. C.B.'s trial testimony establishes that Patel forcibly restrained her liberty by holding her in a locked bathroom and reaching down her pants against her will. She testified that she tried to escape but could not because he had his back against the door and had a hand around part of her neck. C.B. further testified that she was afraid and did not know what else was going to happen.

{¶ 67} To the extent that Patel's appellate argument challenges the credibility of C.B.

and D.H., we note that credibility determinations "are primarily for the trier of fact." *State v. Goldwire*, Montgomery App. No. 19659, 2003-Ohio-6066, ¶13. "'Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness.'" Id. at ¶ 14, quoting *State v. Lawson* (Aug. 22, 1997), Montgomery App. No. 16288. Having reviewed the record, we believe the jury acted well within its discretion in crediting the victims' testimony and finding their allegations to be true. A rational trier of fact could have found Patel guilty of rape, gross sexual imposition, abduction, and five counts of sexual imposition. The evidence does not weigh heavily against those convictions. Accordingly, the second assignment of error is overruled.

{¶ 68} In his third assignment of error, Patel argues that the trial court erred in failing to suppress statements he made to police. In support, Patel asserts that his *Miranda* waiver was invalid and that his subsequent statements were involuntary because the detective who questioned following his arrest him lied about the evidence, promised leniency, threatened him, and allowed him to talk despite knowing that he did not fully understand the process. Patel also claims the investigator refused to honor his request for counsel.

{¶ 69} Having reviewed an audio-video recording of Patel's interview, we find no merit in the foregoing arguments. The waiver of Patel's *Miranda* rights occurred at the outset of the interview. The detective explained each particular right to Patel, who indicated that he

understood. Patel also initialed a rights form indicating that he understood his rights. Patel also acknowledged that he had completed approximately fifteen years of education. Patel then expressly waived his *Miranda* rights by signing a written waiver and agreeing to talk to the detective. Nothing in the record suggests that Patel's Miranda waiver was anything other than knowing, intelligent, and voluntary. Moreover, we see no evidence to support Patel's claim that the detective tricked or coerced him into waiving his *Miranda* rights.

{¶ 70} During the interview that followed the *Miranda* waiver, Patel made certain incriminating statements. In order to obtain the statements, the detective lied about having video evidence that corroborated the allegations against Patel. Specifically, the detective told Patel that C.B. and D.H. had recorded his actions using hidden "key fob cameras." No such evidence existed. The detective also told Patel that it would be "better" for him if he confessed and "worse" if he lied. At various times, the detective added that denying the allegations would "not look good," that the allegations against Patel were "not all that bad," that it would be helpful for Patel to explain what happened, and that things would "go easier" if Patel would "take ownership" for what he did. At one point, the detective also warned Patel that lying would "force us to make an example out of you, legally speaking."

{¶ 71} This court discussed the voluntariness of a confession in *State v. Moore*, Greene App. No. 07CA93, 2008-Ohio-6238, at ¶12-13, as follows:

{¶ 72} "The Due Process Clause requires an inquiry separate from custody considerations and compliance with *Miranda* regarding whether a suspect's will was overborne by the circumstances surrounding the giving of a confession. *Dickerson v. United States* (2000), 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405. Voluntariness of a confession

and compliance with *Miranda* are analytically separate inquiries. *State v. Pettijean* (2000), 140 Ohio App.3d 517, 748 N.E.2d 133. Even if *Miranda* warnings are not required, a confession may be involuntary if the defendant's will was overborne by the totality of the facts and circumstances surrounding the giving of his confession. *Dickerson; Pettijean.*

{¶ 73} "The due process test takes into consideration both the characteristics of the accused and the details surrounding the interrogation. Id. Factors to be considered include the age, mentality, and prior criminal experience of the accused; the length, intensity and frequency of the interrogation, the existence of physical deprivation or mistreatment, and the existence of threats or inducements. *State v. Edwards* (1976), 49 Ohio St.2d 31, 358 N.E.2d 1051. A defendant's statement to police is considered voluntary in the absence of evidence that his will was overborne and his capacity for self-determination was critically impaired due to coercive police conduct. *Colorado v. Spring* (1987), 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954; *State v. Otte*, 74 Ohio St.3d 555, 660 N.E.2d 711, 1996-Ohio-108."

{¶ 74} The circumstances surrounding Patel's incriminating statements fail to demonstrate that his will was overborne. The recording of Patel's interview shows that he understood the English language and responded appropriately to the detective's questions. At the time of his arrest, 42-year-old Patel had three years of college education and worked as the manager of a Fairborn motel. Whenever Patel sought clarification about a question or issue, the detective provided it. The detective also gave Patel water and took a break during the interview.

{¶ 75} Although the detective lied about having video evidence of Patel committing crimes, this misrepresentation did not render Patel's confession involuntary under the totality

of the circumstances. *State v. Reeves*, Greene App. No. 2002-CA-9, 2002-Ohio-4810, ¶13 (citing cases). Nor did the detective make any impermissible threats or promises. As set forth above, the detective made various general statements suggesting that it would be better for Patel to tell the truth. Such admonitions do not render a confession involuntary. *State v. Dobbs*, Greene App. No. 2009CA70, 2010-Ohio-3649, ¶62. Even the detective's warning that Patel might be "made an example of" was essentially an admonition to tell the truth. The statement implied that things would be better for Patel, legally speaking, if he told the truth, which is not enough to render a confession involuntary. Notably absent from the present case are any specific threats or inducements of the type that we have found to invalidate a defendant's confession. See, e.g., *State v. Jenkins*, 192 Ohio App.3d 276, 2011-Ohio-754 (involving a promise to recommend drug treatment, which statutorily was unavailable, in exchange for confession); *State v. Kerby*, Clark App. No. 03-CA-55, 2007-Ohio-187 (holding that a false threat of a death-penalty prosecution undermined the defendant's ability to confess voluntarily); *State v. Petitjean* (2000), 140 Ohio App.3d 517 (involving an assurance that the defendant probably would get probation if he confessed to murder).

**{¶ 76}** Finally, we find no merit in Patel's claim that the detective who interviewed him refused to honor his request for counsel. Near the end of his interview, Patel broached the subject of obtaining counsel. The detective responded by opining that it would be a good idea and encouraging Patel to do so "sooner rather than later."

**{¶ 77}** "A request for an attorney must be clear and unambiguous such that a reasonable police officer in the circumstances would understand the statement to be an invocation of the right to counsel." *State v. Hatten*, 186 Ohio App.3d 286, 2010-Ohio-499,

¶57. "Moreover, when a suspect's mention of counsel does not amount to an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." Id. In the present case, Patel never clearly and unequivocally invoked his right to counsel. We note, too, that the discussion about counsel occurred near the end of the interview, after Patel already had made his incriminating statements. For the foregoing reasons, we find no error in the trial court's refusal to suppress the statements. The third assignment of error is overruled.

{¶ 78} In his fourth assignment of error, Patel claims the trial court erred in allowing him to be convicted and sentenced for allied offenses of similar import. Specifically, Patel contends his abduction conviction should have been merged into his gross sexual imposition and rape convictions.

{¶ 79} The record reflects that the abduction conviction involved Patel's act of restraining C.B. in a bathroom while he stuck his hand inside the back of her pants, constituting gross sexual imposition, and placed a finger in her vagina, constituting rape. Patel argues that his restraint of C.B. was merely incidental to the gross sexual imposition and rape and involved no separate animus. Therefore, he argues that abduction was an allied offense of similar import to the gross sexual imposition and rape.[2]

{¶ 80} In *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, the Ohio Supreme Court announced a new test for determining when offenses are allied offenses of similar import that must be merged pursuant to R.C. 2941.25. *Johnson* held: "When determining whether two offenses are allied offenses of similar import subject to merger under R.C.

---

[2]The parties' briefs do not make clear whether Patel raised an allied-offense argument below with regard to his abduction conviction. In any event, imposing multiple sentences for allied offenses of similar import constitutes plain error. See, e.g., *State v. Wright*, Montgomery App. No. 24276, 2011-Ohio-4874, ¶55. Therefore, we will proceed to address the issue.

2941.25, the conduct of the accused must be considered." Id. at syllabus. It further explained:

{¶ 81} "Under R.C. 2941.25, the court must determine prior to sentencing whether the offenses were committed by the same conduct. Thus, the court need not perform any hypothetical or abstract comparison of the offenses at issue in order to conclude that the offenses are subject to merger.

{¶ 82} "In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense and commit the other with the same conduct, not whether it is possible to commit one without committing the other. * * * If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import.

{¶ 83} "If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.' * * *

{¶ 84} "If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged.

{¶ 85} "Conversely, if the court determines that the commission of one offense will never result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge." Id. at ¶47-51 (citations and quotations omitted).

{¶ 86} In the present case, the State concedes that abduction and rape or gross sexual imposition can be committed by the same conduct. In light of that admission, we must

determine whether abduction and the two sexual offenses were committed by the same conduct and with the same animus.

{¶ 87} "When a course of conduct involves two or more acts or omissions undifferentiated by time, place, or circumstance, merger of multiple criminal offenses arising from that course of conduct is required because the offenses involve the 'same conduct.' " *State v. Johnson*, Montgomery App. No. 24031, 2011-Ohio-2825, ¶25. "As it is used in R.C. 2941.25(B), 'animus' means *animus malus* or evil intent." *State v. Parker*, 193 Ohio App.3d 506, 2011-Ohio-1418, ¶110.

{¶ 88} Here we conclude that Patel's restraint of C.B.'s liberty in the bathroom, an element of his abduction conviction, was part of a single course of conduct that included rape and gross sexual imposition. C.B. testified that Patel entered a bathroom where she was cleaning, locked the door, and proceeded to place a hand down the back of her pants and a finger inside her vagina. Patel's restraint of C.B. in the bathroom was incidental to Patel's commission of the sex offenses and had no independent significance. The restraint and the sexual acts were undifferentiated by time, place, or circumstance.

{¶ 89} Under these circumstances, we are unpersuaded by the State's argument that Patel completed one act, abduction, when he locked the bathroom door and then proceeded to commit separate sexual acts. Indeed, virtually every sexual offense upon another involves some degree of restraint. But here we see no independent significance in his act of locking the door immediately before committing the offenses. The evidence also demonstrates that Patel acted with the same animus or evil intent when he committed abduction, rape, and gross sexual imposition. Patel's immediate intent was to commit the sex offenses. He committed

abduction by restraining C.B.'s liberty solely to facilitate the sex acts that he intended to perform. Therefore, he acted with the same animus when he committed abduction and the sex offenses.

{¶ 90} The Twelfth District Court of Appeals recently reached the same conclusion in *State v. Hernandez*, Warren App. No. CA2010-10-098, 2011-Ohio-3765, which involved abduction and rape in a motel room. The Twelfth District reasoned:

{¶ 91} "Hernandez was charged in the indictment with abducting K.B. with a motive to violate her sexually. Testimony indicated that Hernandez grabbed K.B. around the waist and pushed her into his motel room. Hernandez then locked the door, pushed K.B. onto the bed and then raped her. The force used to compel K.B. into the sexual acts, such as forcing her into the room, pinning her against the bed and knocking her backwards when she tried to leave, was a single course of action, committed with a single state of mind. * * *

{¶ 92} "Hernandez's restraint of K.B. was incidental to the underlying sexual crimes, and had no significance independent of those sexual crimes. Instead, K.B.'s movement from the motel's outside corridor into Hernandez's room was slight, and the detention was no longer than the time necessary to complete the underlying sexual offenses." Id. at ¶52-53 (citation omitted).

{¶ 93} If presented with the same facts as those related in Hernandez we may or may not adopt the holding of the Twelfth district. But the evidence in the present case establishes even more compelling reasons to conclude that Patel's restraint of C.B. was part of a single course of conduct, committed with a single animus, that culminated in completed acts of rape and gross sexual imposition. Therefore, we conclude that in this case, abduction was an allied

offense of similar import to both the rape and gross sexual imposition, although those offenses are separate from each other. As a result, we "must reverse the judgment of conviction and remand for a new sentencing hearing at which the state must elect which allied offense it will pursue against the defendant. *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, ¶24."[3] Patel's fourth assignment of error is sustained.

{¶ 94} In his fifth assignment of error, Patel contends the cumulative effect of the errors alleged in his first four assignments of error deprived him of his right to a fair trial. This argument lacks merit. It is true that separately harmless errors may violate a defendant's right to a fair trial when the errors are considered together. *State v. Madrigal*, 87 Ohio St.3d 378, 397, 2000-Ohio-448. To find cumulative error present, we first must find multiple errors committed at trial. Id. at 398. We then must find a reasonable probability that the outcome below would have been different but for the combination of separately harmless errors. *State v. Thomas*, Clark App. No.2000-CA-43, 2001-Ohio-1353. In our review of Patel's other arguments, however, we found no errors. Therefore, we find no cumulative error. The fifth assignment of error is overruled.

{¶ 95} The judgment of the Greene County Common Pleas Court is affirmed in part and reversed in part, and the cause is remanded for resentencing on allied offenses of similar import as set forth in our analysis of the fourth assignment of error.

. . . . . . . . . . . .

DONOVAN and FROELICH, JJ., concur.

---

[3] "Because R.C. 2941.25(A) protects a defendant only from being punished for allied offenses, the determination of the defendant's guilt for committing allied offenses remains intact, both before and after the merger of allied offenses for sentencing. Thus, the trial court should not vacate or dismiss the guilt determination." *Whitfield*, at ¶27.

Copies mailed to:

Stephen K. Haller
Elizabeth A. Ellis
Jon Paul Rion
Nicole Rutter-Hirth
Hon. Stephen Wolaver